# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| DANA MANZA, individually and on behalf of all others similarly situated,<br><br>      Plaintiff,<br> v.<br><br>PESI, INC.,<br><br>      Defendant. | Case No. 3:24-cv-000690-JDP-AMB |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Dana Manza ("Plaintiff") hereby submits this response in opposition to Defendant's motion to dismiss (ECF Nos. 15-16 (the "Motion" or "Mot.")) filed by Defendant PESI, Inc. ("PESI" or "Defendant").[1]

## INTRODUCTION

Plaintiff brings this consumer class action against Defendant for its systematic and routine violation of consumers' privacy rights as established by the Video Privacy Protection Act ("VPPA"). Defendant, like countless other businesses, charges its customers for access to prerecorded videos and audio visual materials about various topics, including nursing, healthcare, education, and other fields. To increase its customer base and boost sales in the two years preceding the filing of this action, Defendant violated the VPPA in two ways. First, Defendant sold, rented, transmitted, and/or otherwise disclosed records containing the personal information (including names and addresses) of each of its customers, along with detailed information revealing the titles and subject matter of the videos and other audiovisual materials purchased by

---

[1]   For clarity, where Defendant's motion to dismiss is referenced herein, Plaintiff is referring to Defendant's Memorandum in Support of its motion ("Defendant's brief"). *See* ECF No. 16.

each customer, to data miners, data appenders, data aggregators, and marketing companies. The records that Defendant sold, rented, transmitted, and/or otherwise disclosed constituted personally identifiable information within the meaning of the VPPA because it included various categories of information about each of its customers (their name, gender, address, seminar(s) attended) on the customer lists available for purchase on Nextmark's website. *See* 18 U.S.C. § 2710(a)(3). Second, Defendant knowingly installed third-party tracking technologies on its websites that regularly disclosed its consumers' personally identifiable information to third parties that owned the respective technology, such as Meta Platforms, Inc. ("Meta"), Alphabet, Inc. f/k/a Google ("Google"), and Pinterest, Inc. ("Pinterest"). *See* 18 U.S.C. § 2710(b)(1). The information disclosed by the tracking technologies constitutes personally identifiable information because it specifically identifies each customer by name or email address and connects the name or email address to the specific title and corresponding URL of the prerecorded video content requested or obtained from Defendant's website. *See* 18 U.S.C. § 2710(a)(3). The allegations presented in the Amended Complaint (the "Complaint") plausibly state a claim under the VPPA, and Defendant's motion to dismiss should be denied.

## **BACKGROUND**

On October 3, 2024, Plaintiff commenced this action alleging that Defendant violated the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710 by knowingly disclosing her and the other putative class members' personally identifiable information ("PII") to two categories of third parties without their consent. *See* ECF No. 1. On November 22, 2024, Defendant moved to dismiss Plaintiff's complaint. ECF Nos. 11-12. On December 6, 2024, Plaintiff filed an amended complaint, the operative complaint in the case. ECF No. 13.

The Complaint alleges "Defendant violated the VPPA with respect to its disclosure of Plaintiff's and Class members' Personal Viewing Information in two ways."  ECF No. 13, ¶ 2. First, Defendant violated the VPPA by disclosing "its customers' Personal Viewing Information to various third-party recipients, which then appended that information to a myriad of other categories of personal and demographic data pertaining to those customers." *Id.*, ¶ 3.  Defendant then "re-sells that Personal Viewing Information (with the appended demographic information) to other third parties on the open market."[2]  *Id.*  Second, Defendant violated the VPPA by "systematically transmit[ing] . . . its customers' personally identifying video purchase information to third parties, such as Meta . . . Google[] and Pinterest . . . using snippets of programming code." *Id.*, ¶ 4.  The programming code for Meta, Google, and Pinterest is the "Meta Pixel," "Google Analytics," and "the Pinterest Tag" respectively (collectively, "Tracking Technologies").  *Id.* Defendant chose to install these Tracking Technologies on its www.pesi.com website and affiliate websites in violation of the VPPA.  *Id.*

The Complaint then sets forth the factual basis for each theory of Plaintiff's claims, starting with the allegation that Defendant is a "video tape service provider."  *See id.*, ¶¶ 27, 55, 121, 130, 140, 148.  To establish that Defendant is a "video tape service provider," the Complaint details how Defendant operates the website www.pesi.com and its affiliate websites such as Psychotherapy Networker, where it "sells a wide variety of prerecorded video materials, including conferences, seminars, workshops, online/on-demand courses, CDs and DVDs" *Id.*, ¶ 86.

Next, the Complaint alleges that Defendant disclosed Plaintiff's and other consumers' "personally identifiable information" in the two ways described above.  Concerning the list rentals,

---

[2]     Defendant correctly notes that the Complaint refers to "Personal Viewing Information" rather than Personally Identifiable Information ("PII").  *See* ECF No. 16 at 4 n.5. Plaintiff accepts Defendant's classification of "Personal Viewing Information" as Personally Identifiable Information ("PII") as used in the VPPA.

the Complaint alleges and attached two customer lists from Nextmark.com as exhibits, which explain that the 303,967 and 199,167 customers on each list can be personally identified either by name, job title or business location, seminar attended, gender, and more. *Id.*, ¶¶ 55-64.

Concerning the Tracking Technologies, the Complaint also alleges that Plaintiff and putative class members have Facebook, Google, and Pinterest accounts containing personal information about them, and that Defendant allowed third parties to connect the biographical information from their accounts to their personal video-watching history without their consent. *Id.*, ¶¶ 4-8, 65-113.  The Complaint further alleges that Plaintiff and putative class members with Facebook accounts were assigned a unique, numerical Facebook ID ("FID") by Meta and that the "FID" number is personally identifiable information because the numerical ID is indexed to an individual's Facebook account, which includes the individual's name, date of birth, and other personally identifying information.  *See id.*, ¶ 5 ("An FID is a unique sequence of numbers linked to a specific Meta profile."); *id.*, ¶ 90 ("With only a person's FID and the title of the prerecorded video material (or URL where such material is available for purchase) that the person purchased from Defendant on one of its websites—all of which Defendant knowingly and systematically provides to Meta—any ordinary person could learn the identity of the person to whom the FID corresponds and the title of the specific prerecorded video material that the person purchased (and thus requested and obtained).").  The Complaint then alleges that Defendant transmitted this FID to Meta, along with the titles and URLs of the videos its customers requested or obtained.  *See* ECF No. 13, ¶ 65 ("[W]hen a consumer purchases a specific prerecorded video product from Defendant's website, the Meta Pixel technology that Defendant intentionally installed on its website transmits the fact that a consumer purchased prerecorded video materials alongside his or her FID to Meta, without the purchaser's consent and in clear violation of the VPPA."); *id.* at ¶ 79

4

("Every transmission to Meta accomplished through the Meta Pixel includes at least two elements: (1) the website visitor's FID and (2) the URL of the webpage triggering the transmission."); *id*. at ¶ 88 ("During the purchase process on Defendant's website, Defendant uses – and has used at all times relevant hereto – the Meta Pixel to disclose to Meta the unencrypted FID of the person who made the purchase and the specific title of video material that the person purchased (as well as the URL where such video material is available for purchase)."); *id*. at ¶ 91 ("[W]henever Plaintiff or any other person purchased prerecorded video material from Defendant on any of its websites, Defendant disclosed to Meta (inter alia) the specific title of the video material that was purchased (including the URL where such material is available for purchase), along with the FID of the person who purchased it (which, as discussed above, uniquely identified the person).").

The Complaint also alleges Defendant disclosed PII to Google when it disclosed Plaintiff and putative class members' hashed email addresses, numerical identifiers, IP addresses, and uniquely identifiable data points or predefined user dimensions along with the titles of the videos or services the users requested or obtained.  *See* ECF No. 13, ¶ 97.  The Complaint further alleges Defendant disclosed PII to Pinterest when it transmitted the titles of the videos or services the users requested or obtained, along with allowing the Pinterest Tag to access the cookies stored on Plaintiff and putative class members' computers to identify them based on their "user ID ("uid"), which is found in the "s_a" cookie that is an encrypted value identifying only one particular person's Pinterest account." *Id*., ¶ 108.  The Complaint alleges that Plaintiff and putative class members' user IDs for Pinterest are personally identifiable because they are directly linked to their Pinterest accounts, which displays their first and last name, age, gender (optional), email address, country, region, and preferred language.  *Id*.

On December 16, 2024, Defendant filed the instant Motion. ECF No. 16. In it, Defendant argues the Amended Complaint should be dismissed for three main reasons (1) Defendant is not a "video tape service provider" because it is a 501(c)(3) organization and is, thus, not "in the business" of anything; (2) Plaintiff's Web Browser blocked sharing of information to third parties; and (3) Plaintiff does not plausibly allege that Defendant disclosed her specific personally identifiable information to any third party. These arguments are baseless. Non-profit entities are not exempt from liability under the VPPA, and Defendant does not cite a single authority to the contrary. As to Defendant's remaining arguments, Defendant purports to impose a heightened pleading standard on Plaintiff. Defendant further overlooked the overwhelming majority of cases instructing that FIDs are personally identifiable information. As will be shown below, the cases Defendant has cited do not warrant dismissal here, but instead establish that email addresses and GPS coordinates, information Plaintiff alleged that Defendant transmitted here, are personally identifiable information. Therefore, Plaintiff has plausibly alleged an entitlement to relief under the VPPA and Defendant's Motion should be denied.

## VIDEO PRIVACY PROTECTION ACT

The United States Congress passed the VPPA in 1988. President Ronald Reagan signed the legislation into law that same year. It is a relatively simple statute, designed to protect the privacy interests of consumers who request or obtain prerecorded video materials from providers of such services.

The VPPA defines the terms "consumer," "personally identifiable information," and "video tape service provider." The VPPA defines a "consumer" as "any renter, purchaser, or subscriber of goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1). It defines "personally identifiable information" as "information which identifies a person as having

requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(1). It defines a "video tape service provider," in relevant part, as "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials. . . ." 18 U.S.C. § 2710(a)(4).

The VPPA codifies a consumer's privacy right in the video content she or he views. It provides that a "video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person for the relief provided [below]." 18 U.S.C. § 2710(b). Several exceptions to violations of the law are also enumerated, none which the Motion raises.

## APPLICABLE LEGAL STANDARD

When reviewing a motion to dismiss, "the court must accept all well-pleaded, factual allegations as true and draw all reasonable inferences in the plaintiff's favor." *Est. of Mouradian by Mouradian v. Jackson Cnty.*, 23-CV-167-WMC, 2024 WL 1675039, at *3 (W.D. Wis. Apr. 18, 2024) (citing *Alarm Detection Sys., Inc. v. Vill. of Schaumburg*, 930 F.3d 812, 821 (7th Cir. 2019)). The motion to dismiss phase of proceedings "is not an opportunity for the court to find facts or weigh evidence." *My Health, Inc. v. Gen. Elec. Co.*, 15-CV-80, 2015 WL 9474293, at *2 (W.D. Wis. Dec. 28, 2015). Indeed, generally "a district court cannot consider evidence outside the pleadings to decide a motion to dismiss without converting it into a motion for summary judgment." *Jackson v. Curry*, 888 F.3d 259, 263 (7th Cir. 2018).

To survive dismissal, a plaintiff's complaint must plead "enough facts to state a claim to relief that is plausible on its face." *O'Boyle v. Real Time Resolutions, Inc.*, 910 F.3d 338, 342 (7th Cir. 2018) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## ARGUMENT

A "plausible claim" under the VPPA requires a plaintiff to allege that (1) the defendant is a "video tape service provider," (2) the defendant disclosed "personally identifiable information concerning any customer" to "any person," (3) the disclosure was made knowingly, and (4) the disclosure was not authorized by the statutory exceptions. *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1066 (9th Cir. 2015). Plaintiff has clearly and sufficiently alleged all four elements here. Because Defendant challenges only the first two elements, Plaintiff will address those arguments below.

## I.      Plaintiff has plausibly alleged that PESI is a video tape service provider.

The Complaint alleges that Defendant is a videotape service provider because it is "engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." *See* 18 U.S.C. § 2710(a)(3). Defendant's argument that nonprofit organizations can never be videotape service providers under the VPPA is flawed and unsupported by the text of the statute or any relevant case law. On the contrary, the Supreme Court has made clear that "the nonprofit character of an enterprise does not place it beyond the purview of federal laws regulating commerce." *Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*, 520 U.S. 564, 584 (1997). Despite this Supreme Court guidance, Defendant urges this Court to create a limitation to the definition of "video tape service provider" where there is none and exclude nonprofits completely from the requirements of the VPPA. This Court should not and cannot do so.

The VPPA defines a "video tape service provider" as "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video

cassette tapes or similar audio visual materials. . . ."  18 U.S.C. § 2710(a)(4). The statute does not limit the definition of a video tape service provider any further.

The Complaint sufficiently alleges that Defendant is a "video tape service provider" under this definition because it alleges that Defendant "sells a wide variety of prerecorded video materials, including conferences, seminars, workshops, online/on-demand courses, CDs and DVDs on its main website, www.pesi.com, and its network of affiliate websites, which include websites such as https://www.psychotherapynetworker.org/, and others."  ECF No. 13, ¶ 86. The Complaint further alleges that Defendant's sales are made to consumers nationwide.  *Id.*, ¶¶ 122, 131, 140, 149.   As further support to establish that Defendant is a "videotape service provider," the Complaint alleges that "Defendant operates and maintains the Website www.pesi.com, where it **carries out its mission and most significant activity** which is to provide education and training to healthcare professionals, counseling professionals, and the general public through the sale and delivery of prerecorded video content including: conferences, seminars, workshops, online/on-demand courses, CDs and DVDs on various topics."  *Id.*,  ¶ 27 (emphasis added).  Accordingly, the Complaint contains much more than "conclusory statements" and "threadbare recitals of a cause of action." The Complaint clearly, repeatedly, and sufficiently alleges that Defendant is a videotape service provider as defined by the VPPA.

Defendant, however, argues that it is a 501(c)(3) organization and, thus, by the plain meaning of the phrase "engaged in the business of," Defendant can never be a videotape service provider, regardless of whether it sells prerecorded videos because it is not in the business of anything.  ECF No. 16 at 8.  In other words, Defendant asks this Court to adopt a bright-line rule and hold that nonprofit organizations *per se* can never be "engaged in business" because "engaged

in business" requires a profit motive, and therefore, nonprofits are excluded from the requirements of the VPPA.

This argument fails principally because it is well established that "the nonprofit character of an enterprise does not place it beyond the purview of federal laws regulating commerce." *Camps Newfound*, 520 U.S. at 584 (holding Commerce Clause applies to nonprofit institutions, as "entities in both categories are major participants in interstate markets").  As the Supreme Court explained, "Nothing intrinsic to the nature of nonprofit entities prevents them from engaging in interstate commerce," particularly because "they purchase goods and services in competitive markets, offer their facilities to a variety of patrons, and derive revenues from a variety of sources, some of which are local and some out of State."  *Id.* at 585–86.

The Supreme Court's holding applies here. The VPPA regulates videotape service providers whose business affects interstate or foreign commerce.   18 U.S.C. § 2710(a)(4).  Therefore, "the nonprofit character of an enterprise does not place it beyond the purview of" the VPPA.  *Id.* at 584.  Simply put, under Supreme Court precedent, nonprofits do not escape the regulations of the VPPA simply because they do not operate with a profit motive.  Nonprofits who create online video content and sell access to it to people across the country, just like Plaintiff alleges Defendant does here, are still "deriv[ing] revenues from a variety of sources, some of which are local and some out of State," and "purchas[ing] goods and services in competitive markets." Consequently, they can be video tape service providers under the VPPA.  *See also Associated Press v. Nat'l Lab. Rels. Bd.*, 301 U.S. 103 (1937) (nonprofit institutions are subject to laws regulating commerce); *National Collegiate Athletic Assn. v. Board of Regents of Univ. of Okla.,* 468 U.S. 85, 100, n. 22, (1984) (nonprofit institutions are subject to federal antitrust laws).

Indeed, one federal district court recently rejected the same argument Defendant makes here on analogous facts.  In *Krassick v. Archaeological Institute of America*, 21-CV-180, 2022 WL 2071730 (W.D. Mich. June 9, 2022), the court analyzed whether the phrase "engaged in the business of" in the Michigan Preservation of Personal Privacy Act[3]—a state statute analogous to the VPPA—required a profit motive, and found it did not.  *Id.*  The *Krassick* plaintiff alleged that the defendant, a 501(c)(3) nonprofit, had violated the Michigan Preservation of Personal Privacy Act by disclosing records concerning her purchases of its magazines to third parties.  In moving to dismiss the complaint, the defendant argued, as does Defendant here, that the statute did not apply to it on the ground that it was not a "person . . . engaged in the business of selling" magazines because it was not doing so for a profit.  *Krassick*, 2022 WL 2071730, at *5.

In finding that "engaged in business" did not require a profit motive, the *Krassick* court looked first to the standard definition of the words used, reviewing both Black's Law Dictionary and Merriam-Webster.  Black's Law Dictionary defines "business" as (1) "A commercial enterprise carried on for profit; a particular occupation or employment habitually engaged in for livelihood or gain"; (2) "Commercial enterprises"; or (3) "Commercial transactions."  *Business*, Black's Law Dictionary (11th ed. 2019).  It defines "doing business" as "the carrying out of a series of similar acts for the purpose of realizing a pecuniary benefit, or otherwise accomplishing a goal[.]"  *Doing Business*, Black's Law Dictionary (11th ed. 2019).  The Merriam-Webster

---

[3]      The Michigan Preservation of Personal Privacy Act states, in relevant part, the following:

Sec. 2. (1) Subject to subsection (2) and except as provided in section 3 or as otherwise provided by law, a person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials, sound recordings, or video recordings shall not knowingly disclose to any person, other than the customer, a record or information that personally identifies the customer as having purchased, leased, rented, or borrowed those materials from the person engaged in the business.

Mich. Comp. Laws Ann. § 445.1712.

Dictionary defines "business" as "a usually commercial or mercantile activity engaged in as a means of livelihood" or "dealings or transactions of an economic nature." *Business*, Merriam-Webster Dictionary, available at https://www.merriam-webster.com/dictionary/business.

The court found that "[s]ome common concepts emerge from these definitions." *Id.* at *5–6. First, "conducting business typically involves a regular series of transactions." And second, "these transactions generally provide a pecuniary benefit for the business entity." And then, importantly for this case, the court emphasized that "such transactions may or may not stem from a profit motive" as "some definitions include a profit motive and some do not." Some merely require a motive to obtain a pecuniary benefit or "a motive to sustain the 'livelihood,' or existence, of the enterprise." *See Livelihood*, Black's Law Dictionary (11th ed. 2019) (defining "livelihood" as "[a] means of supporting of one's existence"). *Id.*

It then turned to federal precedent regarding the definition of "engaging in business." In doing so, it considered the federal firearm statute, 18 U.S.C. § 921—the same statute Defendant relies on here—along with the Child Protection and Obscenity Enforcement Act of 1988. In comparing these two statutes, the *Krassick* court found that where Congress intended "engaged in business" to require a profit motive, it has said so. For example, in 1986 Congress amended the firearm statute to include in the definition of "engaged in the business" of dealing firearms that the principal objective be for "livelihood and profit." *Id.* Additionally, when Congress enacted the Child Protection and Obscenity Enforcement Act of 1988, it "intentionally looked to the definition of 'engaged in the business'" found in the firearms dealer act, but "eliminated § 921's language requiring a 'princip[al] objective of livelihood and profit.'" *Id.* (citing *United States v. Skinner*, 25 F.3d 1314, 1318 (6th Cir. 1994)).

After this thorough examination of the plain meaning of the phrase "engaged in the business of"—the same phrase that appears in the VPPA—and surveying relevant legal authorities interpreting the phrase, the *Krassick* court concluded that a for-profit motive is not required in order for a person to be "engaged in the business of" selling something.  It found that when "Congress intended 'engaged in the business' to require a profit motive, it expressly stated as much." *Id.* at *7.  It further found that under both Black's Law and Merriam Webster's definitions of "business", one could be engaging in business if engaging in activity to support its *livelihood*, rather than obtain a profit.  *Id.*  Either way, the phrase "engaged in the business of" did not require a profit motive.  *Id.*

This Court should adopt the precise reasoning from *Krassick* and apply it to the present case.  Just as the court stated in *Krassick*, if Congress had intended the VPPA to apply only to those in business for profit, it would have said so.  *See e.g.,* 47 U.S.C. § 227(a) (excluding calls placed by "tax exempt non-profit organization[s]" from the definition of "telephone solicitation" under the Telephone Consumer Protection Act).  Here, Congress did not.  Additionally, just like in *Krassick*, even under the definition Defendant asserts here—that the business must be for the purpose of *livelihood or* profit—nonprofits can still be "engaged in business" to the extent they sell goods or services to support their livelihood rather than for profit.  *Krassick*, 21-CV-180, 2022 WL 2071730, at *7 ("Furthermore, even the Sixth Circuit's interpretation of 'engaged in the business,' which ostensibly requires a purpose for 'livelihood *or* profit,' might apply to [nonprofit defendant] to the extent that [defendant] sells magazine subscriptions to support its *livelihood* rather than to obtain a profit.").

In sum, just as the *Krassick* court found with respect to the similarly-worded Michigan Preservation of Personal Privacy Act,  there is no basis in the text of the statute or existing caselaw

to support Defendant's argument that nonprofits are *per se* excluded from the VPPA.  On the contrary, as articulated above, the text of the statute and existing caselaw reflect that nonprofits can indeed be videotape service providers.  *See Golden v. NBCUniversal Media, LLC*, 688 F. Supp. 3d 150, 156 (S.D.N.Y. 2023) (finding the text of the definition of video tape service provider "is unambiguous" and "it looks to a video's format, rather than its subject matter or *the provider's identity*") (emphasis added).

None of the other areas of law that Defendant analogizes dictate otherwise. For example, Defendant cites *United States v. Gross*, 451 F.2d 1355 (7th Cir. 1971) and *SEC v. Long*, No. 23-CV-14260, 2024 U.S. Dist. LEXIS 111503, *4-5 (N.D. Ill. June 25, 2024). Neither case supports Defendant's position. On the contrary, a proper reading of the holding in *Gross* cuts against Defendant's very argument because, as discussed by the court in *Krassick*, the history of the federal firearm statute shows that when Congress intends to limit "engaged in business" to for-profit motives only, it says so.  Here, Congress did not include any such limitation. Further, the Seventh Circuit did not say a "profit" motive was required, but that the purpose must be for "*livelihood or profit.*"  *Gross*, 451 F.2d at 1357 (emphasis added).  As discussed above, something undertaken for livelihood does not mean the person undertakes it for profit, so a nonprofit organization can certainly sell goods or services for its livelihood. *Gross* does not stand for the proposition that Defendant claims and does not mandate that to be "engaged in business," a company must have profit as its motive.  Therefore, the VPPA applies not only to those who sell, rent, or deliver videos for profit but also to not-for-profit entities like Defendant who sell, rent, or deliver videos for livelihood of the entity.

Defendant's second analogy to securities regulations in *SEC v. Long* similarly falls flat. There, in concluding that selling securities was defendants' regular business, the Court considered

more than just the defendants' profit, and looked also to the "frequency and volume of [d]efendants' trades, along with their business model based on routinely targeting a specific type of microcap issuer for a specific type of transaction." *See* 2024 WL 3161669, at *3 (N.D. Ill. June 25, 2024). In fact, the Court in *Long* specifically included the Black's Law Dictionary definition of "business" that references "livelihood or gain." *Id.* at *2. Other courts interpreting securities regulations confirm that profit is not talismanic of the phrase "engaged in the business of." *See e.g.*, *SEC v. Carebourn Cap., L.P.*, 21-CV-2114, 2023 WL 6296032, *9 (D. Minn. Sept. 27, 2023) (citing *SEC v. Ridenour*, 913 F.2d 515, 517 (8th Cir. 1990) (concluding that defendant was a dealer where he engaged in a "level of activity" that "made him more than an active investor"); *SEC v. Keener*, 580 F. Supp. 3d 1272, 1282 (S.D. Fla. 2022) (stating other courts have similarly asked whether the involvement in buying and selling securities "involves more than a few isolated transactions"); *SEC v. Fierro*, 20-CV-02104, 2023 WL 4249011, at *5 (D.N.J. June 29, 2023) (considering volume of activity)).

Finally, Defendant relies on IRS guidelines for the proposition that, because a not-for-profit entity is organized and operated exclusively for exempt purposes – religious, charitable, scientific, testing for public safety, literary, educational, or other specified purposes – it cannot be in the business of rental, sale or delivery of prerecorded video cassette tapes or similar audio visual materials. ECF No. 16 at 7-8. This argument fares no better than Defendant's others because while Defendant is operated for educational purposes, its educational purposes are carried out by renting, selling, and delivering prerecorded video cassette tapes or similar audio visual materials to consumers nationwide. *See* ECF No. 13, ¶¶ 122, 131, 140, 149.[4]

---

[4]      To the extent this Court considers the IRS website cited by Defendant, Plaintiff respectfully urges this Court to take judicial notice of Defendant's 2022 Form 990, wherein Defendant describes its mission and most significant activity as "To provide education and training to healthcare professionals, counseling professionals, and the general public through seminars and additional educational products including publications, CDs, DVDs, and online/on-

In sum, Defendant points to no legal basis to support its claim that nonprofits *per se* can never be engaged in the business of anything and thus can never be a video tape service provider under the VPPA. The cases Defendant cited, and the analogies Defendant draws, do not hold so. Instead, Defendant asks this Court to insert an additional requirement into the VPPA's definition of videotape service provider where Congress did not do so.   This Court should decline Defendant's invitation to rewrite the VPPA for its own benefit.  The Complaint states a claim and the Motion should be denied.

## II.     The Complaint Does Not Allege Plaintiff's Default Browser is Mozilla Firefox

Grasping at straws, Defendant relies on a misreading of paragraph 105 of the Complaint to argue that Plaintiff alleges "she used the internet browser Mozilla Firefox, which blocks all tracking technologies by default."  Defendant is mistaken; Plaintiff did not allege she used Mozilla Firefox when using Defendant's websites.  Paragraph 105 alleges, "In sum, *as an example* of the information disclosed by Defendant to Google Analytics, the information would reveal that a 34-year-old woman from Charlotte, North Carolina (North America - USA) at her home's IP Address 69.217.130.96 using Mozilla Firefox on a MacOsX Sierra Studio computer requested or obtained a specific video product from www.pesi.com."  *See* ECF No. 13, ¶ 105 (emphasis added).  This allegation is exactly what it says it is – a general example of the information disclosed and does not purport to represent the named plaintiff's experience.

Defendant's position is further belied by the Complaint's jurisdictional allegations concerning Plaintiff's citizenship and domicile in Nassau County, New York, rather than Charlotte, NC.  *Id.*, ¶ 13.  Defendant's own records will confirm that Plaintiff has no connection

---

demand courses."  *See* PESI Inc., IRS Form 990, Return of Organization Exempt from Income Tax (2022), https://apps.irs.gov/pub/epostcard/cor/263896894_202212_990_2023120522067747.pdf (last visited January 6, 2025).

to Charlotte, NC because the Complaint further alleges that "Defendant completed its sales of goods to Plaintiff by delivering the prerecorded video material she purchased to the address she provided in her order[,]" which, as noted above, was a New York address. *Id.*, ¶ 15.  In fact, Plaintiff did not use Mozilla Firefox as the browser on her computer or mobile device.  However, the question of whether Plaintiff's browser settings allowed her cookies to be automatically detected is a factual question that courts have not addressed at the pleading stage and instead reserve that question for later stages of litigation.  *See*, *e.g.*, *Ambrose v. Bos. Globe Media Partners LLC*, No. CV 21-10810-RGS, 2022 WL 4329373, at *2 (D. Mass. Sept. 19, 2022) (order denying defendant's motion to dismiss, finding defendant's arguments about plaintiff's cookie and browser settings are "not appropriate for disposition" at the pleading stage).

Without addressing the decisions like the one reached in *Ambrose*, Defendant inappropriately cited *Martinez v. D2C, LLC*, No. 23-21394-CIV, 2024 WL 4367406, at *7 (S.D. Fla. Oct. 1, 2024), which is procedurally distinguishable because it was an order denying a plaintiff's motion for class certification rather than a motion to dismiss.  Indeed, the court in *Martinez* never even ruled on a motion to dismiss in that case.  Consequently, its holding is irrelevant here.  Therefore, this Court should reject Defendant's invitation to decide a factual issue at the pleading stage, though the allegations confirm Plaintiff never pleaded her specific browser, nor was she required to.  *See Ambrose*, 2022 WL 4329373, at *2 (D. Mass. Sept. 19, 2022).

Defendant's motion should therefore be denied.

### III.    The Complaint Plausibly Alleged Defendant disclosed Plaintiff's PII
#### a. Data Brokerage Allegations

Defendant argues that Count I of Plaintiff's Amended Complaint fails to allege a VPPA claim because (1) the Complaint fails to name the third parties (data cooperatives, direct-mail advertisers, direct marketers, data brokers, data appenders, data miners, or marketing companies)

who received the customer lists and resulting PII therefrom, *see* ECF No. 16 at 12; (2) the mailing lists attached to the Complaint "do not purport to identify Plaintiff or 'the prerecorded particular audio-visual product(s) [she] purchased' from PESI . . . or indicate the mailing lists contain her PII, *see* ECF No. 16 at 13; and (3) the Complaint fails to "allege any facts that support that PESI disclosed her PII to NextMark." *See* ECF No. 16 at 14.  Defendant's arguments are without merit for several reasons.

First, Rule 8 does not require that a plaintiff name each and every third party to whom these disclosures were made.  Plaintiff cannot possibly be expected to allege the specific dates of these non-consensual, uninformed disclosures or all of the entities to whom Defendant made these non-consensual, uninformed disclosures, absent a reasonable opportunity for discovery.  By demanding such specificity in the Motion, Defendant asks the Court to adopt a pleading standard that no VPPA plaintiff could ever satisfy, emasculating this important consumer protection statute and inoculating the company from liability under it in the process.  This Court need not go along.  *See, e.g., Zimmerman v. 3M Company*, 542 F. Supp. 3d 673, 681 (W.D. Mich. 2021) (Rule 8 pleading standard was satisfied in class action where named plaintiffs alleged that they were exposed to purportedly harmful chemical in drinking water, without alleging "whether any PFAS ha[d] been detected in their drinking water, and if so, how much"); *Rodriguez-Reyes v. Molina-Rodriguez*, 711 F.3d 49, 53-54 (1st Cir. 2013) (explaining that a complaint can survive a 12(b)(6) motion even if it does not "plead [all the] facts sufficient to establish a prima facie case" nor set forth "detailed factual allegations").

To support Defendant's flawed argument however, it relies on two patently distinguishable cases: *Rodriguez v. Sony Computer Ent. Am. LLC*, No. C 11-4084 PJH, 2012 WL 12921066, at *1 (N.D. Cal. Apr. 20, 2012) and *Pett v. Publishers Clearing House, Inc.*, No. 22-11389, 2023 WL

3606655, at *8 (E.D. Mich. May 23, 2023). In *Rodriguez*, the plaintiff brought a VPPA class action against Sony Computer Entertainment America ("SCEA") and Sony Network Entertainment International ("SNEI") and their "subsidiaries, agents, affiliates, and third-party affiliates," named as John Doe Defendants, for alleged violations of the VPPA. *See* 2012 WL 12921066, at *1. The *Rodriguez* complaint described the John Doe Defendants as "SCEA's and SNEI's subsidiaries, agents, affiliates, and third-party affiliates that directly participate in the acts and practices alleged herein. . . [who] purchase, view, or receive, and otherwise have access to SCEA's and SNEI's customers' 'personally identifiable information' . . . and its customers' movie and video game purchase and rental histories." *See Rodriguez*, ECF No. 33, ¶ 12 (N.D. Cal.). The *Rodriguez* complaint further alleged in generic fashion that "SCEA shares and/or sells its customers' movie and video game purchase and rental histories with SNEI and John Does Defendants 1-10" and that "SNEI and John Doe Defendants 1-10 use such 'personally identifiable information'" for marketing purposes. *See id.*, ¶ 36-37. As evidence of this practice, the plaintiff in *Rodriguez* cited only SNEI's privacy policy in the complaint, which stated, "SNEI ***may*** use personally identifying information for marketing and demographic studies." *See id.*, ¶ 48 (emphasis added). The plaintiff did not allege that the defendant actually transmitted the PII, only that the privacy policy indicated it would. Further, the plaintiff did not allege that the entities to whom the PII was transmitted were the type of entity that fell outside the scope of disclosures permitted under the VPPA. Consequently, the court dismissed the *Rodriguez* complaint, finding *inter alia* that the plaintiff failed to allege "that a disclosure has affirmatively taken place, identify with particularity the person(s) or entity to whom such disclosure was made, or state that any such disclosure falls outside the scope of disclosures permitted under the VPPA." *See id.*

Here, the Complaint alleges precisely what the plaintiff in *Rodriguez* did not: Plaintiff has affirmatively alleged that the rental, sale, and disclosure of the customer lists actually occurred, that the recipients of Defendant's disclosures are outside the scope of permissible entities who could receive the information without liability under the VPPA, and that Defendant's disclosures "resulted in a barrage of unwanted junk mail" to Plaintiff's home. ECF No. 13, ¶ 11. Unlike the hypothetical disclosure alleged in *Rodriguez*, the Complaint, in this case, affirmatively alleges the disclosures actually occurred, not just that Defendant has a privacy policy indicating disclosures, by referencing two mailing lists offered for sale by Nextmark and explaining the injury Plaintiff suffered as a consequence. Next, the Complaint alleges *unrelated* third parties purchased the lists made available on the Nextmark website, which is unlike the related third-party subsidiaries at issue in *Rodriguez*. *See id.*, ¶¶ 55-64. Consequently, *Rodriguez* does not demand dismissal here.

Defendant's reliance on *Pett v. Publishers Clearing House, Inc.*, is equally unavailing. In Pett, the court specifically rejected "[d]efendant's argument that 'whether the entity selling or renting the lists was [defendant] is left entirely to impermissible speculation.'" *See* 2023 WL 3606655, at *7. Indeed, the court in *Pett* denied the motion to dismiss as directed at "[p]laintiffs' claims of disclosures to NextMark and LSC." *See id.*, at *7. Therefore, neither *Rodriguez* nor *Pett* is applicable to the case before this Court. Because the Complaint clearly alleges that Defendant transmitted its customer's PII to NextMark and other data brokers and aggregators, Defendant's Motion should be denied.

Second, contrary to Defendant's argument, the Complaint clearly alleges that Defendant disclosed data files containing Plaintiff's and its customers' personally identifiable information as defined by the VPPA – which, again, necessarily included Plaintiff and putative class members' names, employers, and the specific seminars attended – to data aggregators and appenders for

compensation, that the aggregators and appenders then sent the files back to Defendant together with the additional demographic and personal information that they had appended to the file about each of the customers, and that Defendant then marketed and sold these customer lists, "enhanced" with the data added to them by the appenders and aggregators, to other third parties for more money. ECF No. 13, ¶¶ 3, 60-61. These allegations are corroborated by the "data cards" attached as Exhibits A and B to the Complaint, which Defendant used to publicly advertise, rent, sell, and otherwise disclose the PII of its customers for compensation. *See id.*, ¶¶ 57-58 (incorporating screenshots of the data cards). As shown in the data cards, Defendant advertises the availability of various categories of information about each of its customers on its customer list available for rental, including, inter alia, "job title," "gender/sex," "seminar," "SCF" and "seminar category." *See id.* Moreover, each data card breaks down the gender of the individuals who make up the total universe of PESI customers, and each data card specifically advertises that purchasing either list would result in access to all listed categories for each individual. *See id.* That Defendant possesses this sort of demographic and personal information about each of its customers, and offers to sell, rent, and otherwise disclose it for compensation to any third party interested in acquiring it, adds strong support to Plaintiff's allegations that Defendant disclosed its customers' nonpublic personal information (including their names, and addresses, the fact that each of them had purchased products from Defendant, and the products and the dollar amounts of the products they purchased) to third-party data aggregators and appenders, because those are the entities that the Complaint alleges appended this additional demographic and personal information about each of Defendant's customers to Defendant's customer files before sending the files back to Defendant.

Third, contrary to Defendant's argument, the Complaint specifically alleges: "Defendant knowingly rented, sold, or otherwise disclosed their customers' Personal Viewing Information to

data aggregators, data miners, data brokers, data appenders, and other third parties" and specifically names NextMark as one of the third-party recipients. *See* ECF No. 13, ¶¶ 3, 60-61, 125. And again, the mailing lists included in and attached to the Complaint demonstrate that Defendant did just that: disclosed Plaintiff and putative class members' personally identifiable information to renters and purchasers of its customer files. The Complaint bolsters these factual allegations by also specifically alleging that, as a result of "Defendant's practice of disclosing its customers' Personal Viewing Information," the named Plaintiff and putative class members received "a barrage of unwanted junk mail." *See id.*, ¶ 11.

In analogous data-privacy cases under other state statutes, which involved the same types of disclosures of consumer information at issue in this case, courts have not hesitated to find such allegations sufficient to survive motions to dismiss pursuant to Rule 12(b)(6). *See e.g.*, *Horton v. GameStop Corp.*, 380 F. Supp. 3d 679, 682 (W.D. Mich. 2018) (finding allegations that defendant disclosed all of its customers' information, including the plaintiffs' information, to third-party data aggregators and appenders, data cooperatives, aggressive marketers, and other third-party renters of customer lists, together with a copy of data card reflecting defendant's advertising of such information for sale and rental, adequately alleged unauthorized disclosures of the plaintiff's information to third parties in violation of violation of Michigan's Preservation of Personal Privacy Act); *Batts v. Gannett Co.*, 2023 WL 3143695, at *4–5 (E.D. Mich. Mar. 30, 2023) (same); *Russett v. NTVB Media, Inc.*, No. 22-10352, 2023 WL 6315998, at *2 (E.D. Mich. Sept. 28, 2023) (same); *Gaines v. Nat'l Wildlife Fed'n*, No. 22-11173, 2023 WL 3186284, at *4 (E.D. Mich. May 1, 2023) (same); *Nock v. Boardroom, Inc.*, No. 22-CV-11296, 2023 WL 3572857, at *4 (E.D. Mich. May 19, 2023) (same); *Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 452 (S.D.N.Y. 2016) (same); *Piper v. Talbots, Inc.*, 507 F. Supp. 3d 339, 343-44 (D. Mass. 2020) (denying a motion to

dismiss where the complaint alleged that the defendant "sold PII of plaintiffs and other customers to third parties without notice or consent" and that, as a result, the plaintiffs "received unwanted junk mail and telephone solicitations," which the court found "allow[ed] for a reasonable inference that [plaintiffs PII] was disclosed to third parties" in violation of Virginia's Personal Information Privacy Act).   This Court should follow suit and find that the factual allegations from the Complaint plausibly state a claim for violation of VPPA and deny Defendant's motion.[5]

### b. Meta Allegations

Defendant argues Count II should be dismissed because the Complaint fails to "allege: (a) what information about her, if any, is available on [Plaintiff's] Facebook account; (b) that her Facebook account is public and not private; and (c) that she was logged into her Facebook account at the time she purchased the Training—each of which would be necessary in order to plausibly allege that PESI disclosed her PII."  ECF No. 16.  In doing so, Defendant is again attempting to impose a heightened pleading standard.  However, contrary to Defendant's arguments, Courts have consistently held that Facebook IDs disclosed to Meta in combination with the URLs or names of videos requested or obtained by consumers constitute "personally identifiable information" under the VPPA.  Defendant does not cite a single case indicating otherwise.  *See* ECF No. 16.  On the contrary, Defendant repeatedly emphasizes authorities which themselves support Plaintiff's position that Defendant disclosed personally identifiable information.  *See id.*

---

[5] In footnote 2 of the Defendant's brief, Defendant asks this Court to consider or take judicial notice of the "entirety of PESI's website."  Taking judicial notice of Defendant's website forecloses Defendant's later argument found on Page 13 that "Plaintiff cannot allege that she attended either seminar or that she located any of her information on either of these mailing lists."  While this argument is a factual issue that is inappropriate for resolution at the pleading stage, should this Court take notice of Defendant's website, the Court will see that the exact course Plaintiff purchased is found and advertised under the "Healthcare" tab, signifying that Plaintiff's information is within the Healthcare Seminar Attendees Mailing List data set that Defendant was selling and that is attached as Exhibit A to the Complaint. *See* PESI, *Search Details* https://healthcare.pesi.com/search?keyword=integrative+sex+and+couples&keywordSearchType=All (last visited January 7, 2025).

The VPPA defines "personally identifiable information" as "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."  18 U.S.C. § 2710(a)(1).  In this case, the Complaint alleges that Defendant disclosed to Meta the Facebook IDs of Defendant's customers and that its disclosure of those Facebook IDs was paired with the URLs of the webpages where consumers watched or purchased prerecorded videos from Defendant.  ECF No. 13, ¶¶ 65-95.  As alleged in the Complaint, the URLs identify and contain the names of the videos requested or obtained by consumers.  *Id.*, ¶¶ 18, 88, 90-91.  Facebook IDs are personally identifying to Meta and any other person because they are indexed to an individual's Meta account, which, as the Complaint alleges, includes the individual's first and last name and "other personally identifying information about the person." *Id.*, ¶ 5.  The other personally identifying information generally includes information provided at the time one signs up for their Facebook account, such as "first and last name, birth date, gender, and phone number or email address."  *Id.*, ¶ 66.  To the wider public, Facebook IDs are personally identifying because anyone in possession of a Facebook ID can use it to identify a person's Facebook account, which displays their name and other identifying information.  *See e.g.*, *id.* at ¶¶ 5, 90.

Courts have held that substantially similar disclosures sufficiently allege "personally identifiable information" within the meaning of the VPPA.  *See, e.g.*, *Harris v. Pub. Broad. Serv.*, 662 F.Supp.3d 1327, 1334 (N.D. Ga. 2023) (holding that the "bundling of the [Facebook ID] from the c_user cookie with the URLs of the videos Plaintiff watched" satisfies the disclosure element); *Belozerov v. Gannett Co.*, 646 F.Supp.3d 310, 314 (D. Mass. 2022) (finding a Facebook ID meets the definition of personally identifiable information) (collecting cases); *Lebakken v. WebMD, LLC*, 640 F. Supp. 3d 1335, 1342 (N.D. Ga. 2022) ("[Plaintiff] adequately alleged that [defendant]

disclosed her Facebook ID and email address in connection with her video viewing information to Facebook and that the disclosure of such information constituted a disclosure of PII."); *Ellis v. Cartoon Network, Inc.*, No. 14 Civ. 484 (TWT), 2014 WL 5023535, at *3 (N.D. Ga. Oct. 8, 2014) (same), *aff'd on other grounds*, 803 F.3d 1251 (11th Cir. 2015). The Southern District of New York recently summarized the jurisprudential landscape on this subject, writing that "Courts have *uniformly* held Facebook IDs to constitute PII under the VPPA, particularly where—as here—the plaintiff alleges that her Facebook ID was disclosed alongside the viewed video's URL and name." *Golden*, 688 F. Supp. 3d at 159 (emphasis added) (collecting cases). In *Li v. Georges Media Grp. LLC*, the court stated "many courts have found that FIDs constitute PII under the statute. At the very least, Meta can easily 'link' the FID to a specific user." No. CV 23-1117, 2023 WL 7280519, at *4 (E.D. La. Nov. 3, 2023) (internal citations omitted) (denying defendant's motion to dismiss). In *Czarnionka v. Epoch Times Association, Inc.*, the court found that "[t]he FID itself represents a particular individual." 2022 WL 17069810 at *3 (denying defendant's motion to dismiss). Each of these authorities collects numerous others reaching the same conclusion.

Here, the Complaint's allegations are almost identical to those in *Jackson v. Fandom, Inc.*, No. 22-cv-04423-JST, 2023 WL 4670285, at *4 (N.D. Cal. July 20, 2023) (denying a motion to dismiss, finding personally identifiable information was plausibly alleged where the plaintiff claimed that "a user's Facebook profile may contain the user's name, gender, birthday, place of residence, career, educational history, a multitude of photos, and the content of a Facebook user's posts."). Plaintiff's Complaint alleges: "A Meta profile . . . identifies by name the specific person to whom the profile belongs (and also contains other personally identifying information about the person)." ECF No. 13, ¶ 5. It also alleges that a Facebook ID "identifies a person more precisely than a name, as numerous persons may share the same name, but each person's Facebook profile

(and associated FID) uniquely identifies one and only one person." *Id*.  It further alleges that in order to create a Meta account (and obtain a corresponding Facebook ID), an individual needs to provide Meta their name, birthday, name, and phone number or email address.  *Id*., ¶ 66.  Finally, the Complaint ties those allegations to the named Plaintiff by alleging that she had a "Meta account, a Meta profile, and an FID associated with such profile," when she purchased the prerecorded video from Defendant.  *Id*., ¶¶ 13-16. This is sufficient to plausibly allege that the information disclosed by Defendant was personally identifiable information as defined by the VPPA.  *See also Feldman v. Star Trib. Media Co. LLC*, 659 F. Supp. 3d 1006, 1020–21 (D. Minn. 2023) (finding that a plaintiff plausibly alleged his personally identifiable information was disclosed via the Meta Pixel when he alleged that his Facebook profile contained his name, "making it feasible to identify [him] by reference to this information.").

To the extent that Defendant argues Plaintiff needed to allege her profile was set to public, such a standard is not required by the majority of courts.  In fact, such a requirement violates the command of Rule 8 and Supreme Court precedent.  *See e.g.*, *Stark v. Patreon, Inc.*, 656 F. Supp. 3d 1018, 1025 (N.D. Cal. 2023) (finding that "a plaintiff's burden at the pleading stage is relatively light[,]" citing Rule 8, and relating that discussion to *Twombly* and *Iqbal*).

Instead of confronting Rule 8 head on, Defendant relies on three inapposite cases involving technical pleading defects and allegations that are patently distinguishable from the Complaint in this case: *Heerde v. Learfield Commc'ns, LLC*, No. 2:23-CV-04493-FLA, 2024 U.S. Dist. LEXIS 137781, *7-8 (C.D. Cal. July 19, 2024), *Ghanaat v. Numerade Labs, Inc*., 689 F. Supp. 3d 714, 720 (N.D. Cal. Aug. 28, 2023), and *Solomon v. Flipps Media, Inc*., No 22-CV-5508, 2023 U.S. Dist. LEXIS 176480, *6 (E.D.N.Y. Sept. 30, 2023).  In each of these cases, the plaintiffs failed to allege that a person is required to submit certain personally identifiable information to create a

Facebook account, that the respective plaintiff created an account in satisfaction of that requirement, and that the personally identifiable information could identify that plaintiff. *See Heerde*, 2024 WL 3573874, at *4 ("Plaintiffs fail to allege their PII was disclosed because they do not identify what information on their Facebook pages, if any, was viewable and could be used to identify them. *See* Compl. ¶¶ 139–40. "); *Ghanaat*, 689 F. Supp. 3d at 720 ("Here, plaintiffs' allegations are inadequate because they do not allege their Facebook pages contain any personal information, such as their names or email addresses."); *Solomon*, 2023 WL 6390055, at *3 ("As her complaint says nothing about any personal information on her public Facebook profile page, her VPPA claim fails.").

In this case, Plaintiff's complaint specifically ties allegations concerning what appears on a Facebook profile with Plaintiff's experience thereby distinguishing this case from those cited by Defendant. *Compare* ECF No. 13, ¶ 66  ("To create a Meta account, a person must provide, inter alia, his or her first and last name, birth date, gender, and phone number or email address.") *with* ECF No. 13, ¶ 16 ("At all times relevant hereto, including when purchasing, requesting, and obtaining the prerecorded video material from Defendant's website, Plaintiff had a Meta account, a Meta profile, and an FID associated with such profile."); ECF No. 13, ¶ 18 ("When Plaintiff purchased prerecorded video material from Defendant on its website, Defendant separately disclosed Plaintiff's FID") and ECF No. 13, ¶ 88 ("During the purchase process on Defendant's website, Defendant uses – and has used at all times relevant hereto – the Meta Pixel to disclose to Meta the unencrypted FID of the person who made the purchase and the specific title of video material that the person purchased (as well as the URL where such video material is available for purchase).").  Because the Complaint alleges a Facebook profile contains "sufficient identifying information" such as "name, gender, birthday. . .", *Ghanaat* is inapplicable and the *Heerde*

27

standard (which Defendant cites, but is not controlling) is met.  *See Heerde*, 2024 WL 3573874, at *4.  As courts have "uniformly" held in similar cases, the allegations in the Complaint that Plaintiff's Facebook IDs and the URLs of the video materials they requested or obtained from Defendant constitute personally identifiable information within the meaning of the VPPA are sufficient to state a claim.  *See Golden*, 688 F. Supp. 3d at 159.  Because Count II is plausibly alleged, Defendant's Motion should be denied.[6]

### c.   Google Allegations

Defendant argues Count III should be dismissed because the Complaint fails to allege: (a) "PESI shared her PII with Google"; (b) "her own identifiers that she puts at issue"; and (c) "the information allegedly disclosed to Google qualifies as PII . . . [under] the ordinary person standard for PII."  ECF No. 16 at 17-21.  The gravamen of Defendant's position is that the specific data points, IP addresses, and email addresses alleged in the complaint are insufficient to constitute personally identifiable information under *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 289 (3d Cir. 2016) because they do not meet "the ordinary person standard".  In other words, the information cannot constitute PII because an "ordinary person" could not use it to identify the user. But that is not the standard Plaintiff must meet.  As explained above, "personally identifiable information" is defined as "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."  18 U.S.C. § 2710(a)(1). Even assuming *Nickelodeon* controlled the outcome in this matter, which it does not because the

---

[6]     To the extent Defendant argues that it cannot find Plaintiff's Facebook profile, on December 23, 2024, Plaintiff served discovery on Defendant, including a notice of subpoena to Meta, which identified Plaintiff's FID. Based on this subpoena, Defendant can properly identify Plaintiff's Facebook profile, which lists her name and includes a picture revealing her gender and race.  While Defendant's argument on the identification of Plaintiff's profile and the public or private nature of her profile are issues that should not be resolved at the pleading stage, Plaintiff must reiterate that Defendant has again cited *Martinez*, a case resolved at the motion for class certification stage.

Seventh Circuit has not adopted that decision, Defendant's arguments concerning Google are without merit for several reasons.

First, this Court need not apply *Nickelodeon* nor any of the cases cited therein because they adopt an overly rigid definition of "personally identifiable information" that is unsupported by the plain language of the VPPA and Congressional intent as explained in *Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 486 (1st Cir. 2016). In *Yershov*, the First Circuit (with retired Justice Souter sitting by designation) held that the term "personally identifiable information" encompasses "information *reasonably and foreseeably* likely to reveal which . . . videos [a person] has obtained." *Id.* (emphasis added). It noted that the phrase "personally identifiable information" is "awkward and unclear" and that its statutory definition "adds little clarity beyond training our focus on the question [of] whether the information identifies the person who obtained the video." *Id.* Nevertheless, it wrote, "the language reasonably conveys the point that [personally identifiable information] is not limited to information that explicitly names a person," and it gave a succinct and persuasive reading of the term's broader scope through textual analysis, legislative history, and colloquial sports analogies. *Id.*

The First Circuit's approach permits more consideration of the receiving party's ability to link the disclosed information to an individual's identity than Defendant urges this Court apply here. *Id.* Expanding on an earlier analogy concerning the numbers on football players' jerseys, the Court wrote that "when Gannett makes such a disclosure to Adobe, it knows that Adobe has the 'game program,' so to speak, allowing it to link the GPS address and device identifier information to a certain person by name, address, phone number, and more." *See also Robinson*, 152 F. Supp. 3d 176 (S.D.N.Y. 2015) (stating that allegations of a "correlated look-up table" that would "enable Adobe to link the hashed serial number of [the plaintiff's] Roku device and his

viewing choices to his identity" would satisfy the personally identifiable information pleading standard.). This "game program"—the recipient's ability to link the information it received with the name or other identifying information of the person—made the information transmitted "personally identifiable information."

Consequently, just as the court did in *Yershov*, this Court need not apply the "ordinary person" test as it contravenes the text and clear legislative history and purpose of the VPPA. *See In re Vizio, Inc., Consumer Priv. Litig.*, 238 F. Supp. 3d 1204, 1226 (C.D. Cal. 2017) ("The Court finds *Yershov* to be a more persuasive interpretation of the VPPA than *In re Nickelodeon* . . . [because] *Yershov* focused foremost on the text of the statute, while *In re Nickelodeon* turned quickly to "the more controversial realm of legislative history."); *Yershov*, 820 F.3d at 486 ("Nevertheless, the language reasonably conveys the point that PII is not limited to information that explicitly names a person. Had Congress intended such a narrow and simple construction, it would have had no reason to fashion the more abstract formulation contained in the statute."). Under the correct standard as laid out in *Yershov*, the Complaint's allegations are sufficient to fall squarely within the VPPA's broad definition of "personally identifiable information".

Furthermore, even under the heightened and incorrect standard promulgated by Defendant, the Complaint still sufficiently alleges that Defendant transmitted Plaintiff's PII to Google. Here, the Complaint alleges Defendant disclosed several pieces of PII to Google – email addresses and IP addresses – which, standing alone, qualify as PII, but even more so when combined with the specified user dimensions (gender, age, language), device identifiers, and browser settings. Starting with an email address, the Complaint sufficiently alleges this information is personally identifiable information because it alleges that "[a]n email address . . . designate[s] an electronic mailbox" that is registered or associated with only one individual. ECF No. 13, ¶ 102. The

Complaint further alleges that Plaintiff had a Google account, corresponding account profile, and unique identifiers associated with that account and profile. *See id*., ¶ 17.   Then, the Complaint explains the process for Defendant's disclosure to Google by alleging that "Defendant discloses to Google Analytics, through the operation of the Google Analytics, the user's (i) hashed email address, (ii) Google Analytics client ID, (iii) the title, unique numerical identifier, and URL of the video the user is watching, and (iv) excessive amounts of uniquely identifiable data points, or predefined user dimensions." *See id*., ¶ 97.   The Complaint finally ties the disclosure allegations to Plaintiff's experience by alleging that "Defendant knowingly disclosed Plaintiff's and Google Analytics Class members' Personal Viewing Information to Google via the Google Analytics's integrated technology . . . knowing that such code would transmit the prerecorded video content purchased by its consumers and the purchasers' . . . hashed email address, IP addresses, and other user identifiers." *See id*., ¶ 143.   Several courts have held that email addresses are PII.  *See Lebakken,* 640 F. Supp. 3d at 1342 (finding that disclosure of *inter alia* an email address is PII); *See Hausburg v. McDonough*, No. 8:20-CV-2300-JSS, 2023 WL 2432322, at *1 (M.D. Fla. Mar. 9, 2023) (finding email addresses were personally identifiable information such that good cause exists to seal filings in a federal employment action); *see generally Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 981 (9th Cir. 2017) (declaring that "an email address may very well readily enable an 'ordinary person' to identify an individual" but leaving the question for another day); *Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 549 n.10 (2d Cir. 2024) (recognizing that "[s]ome of the legislative history suggests that Congress intentionally used that word to help keep the 'personally identifiable information' term broad . . . [thus] there may be breathing room in the statute to explore what exactly is "personally identifiable information.").

Next, Plaintiff alleges that multiple IP addresses are disclosed and have been disclosed to Google when prerecorded video content is requested or obtained.  Specifically, the Complaint alleges that these IP addresses are PII because they "create an approximate map to follow the subscriber across devices and locations."  *See* ECF No. 13, ¶¶ 104, 107.  The Complaint then alleges that Plaintiff experienced this precise type of disclosure, stating that when she requested or obtained prerecorded material from Defendant, it disclosed the device she requested or obtained it from.  *See id.*, ¶ 18.  These allegations distinguish this case from *Nickelodeon*, where the plaintiff did not allege, and the court did not examine or analyze, whether continued disclosure of IP addresses that create a map for a specific consumer across multiple locations and devices constitutes PII.

The continuous association of the IP addresses with the named Plaintiff or any putative class member's PESI.com account, unique device identifiers, and email address makes this case most analogous to *Yershov*, in which the Court held that GPS coordinates constituted PII.  *See Yershov*, 820 F.3d at 486 ("To use a specific example, imagine Gannett had disclosed that a person viewed 146 videos on a single device at 2 sets of specified GPS coordinates. Given how easy it is to locate a GPS coordinate on a street map, this disclosure would enable most people to identify what are likely the home and work addresses of the viewer (*e.g.,* Judge Bork's home and the federal courthouse). And, according to the complaint . . . a disclosure to Adobe . . allow[s] it to link the GPS address and device identifier information to a certain person by name, address, phone number, and more.").

Similar to the disclosure in *Yershov*, Defendant's disclosures of multiple IP addresses and other information directly allow Google Analytics and other Google technology (Google Adsense and Google Leads) to directly link a specific consumer to the prerecorded video material requested

or obtained at various locations.  *See id.*, ¶¶ 97-107.  Consequently, Plaintiff has sufficiently alleged Defendant transmitted her PII to Google.  Moreover, even under the *Nickelodeon* test, all of the information that Plaintiff alleged Defendant transmitted to Google would allow any ordinary person to follow the IP addresses to approximate GPS locations for each IP address disclosed by Defendant, and connect a specific individual to the videos or services he or she requested or obtained because each disclosure also contained the corresponding URL of the prerecorded video content being requested or obtained.  Thus, even under the incorrect standard Defendant advances, Plaintiff has sufficiently alleged that Defendant transmitted her PII to Google.

However, the Court need not resolve this factual issue at the pleading stage.  *In re Vizio, Inc., Consumer Priv. Litig.*, 238 F. Supp. 3d 1204, 1226 (C.D. Cal. 2017) (refusing to issue a determination as to what constitutes PII as a matter of law at the pleading stage, but finding that the array of data alleged to have been disclosed was sufficient to defeat the motion to dismiss).[7] Because Count III is plausibly alleged, Defendant's Motion should be denied.

### d.  Pinterest Allegations

Finally, Defendant raises the same arguments against Plaintiff's Pinterest claims as it does to Plaintiff's Google claims.  ECF No. 16 at 21-24.  Here, the Complaint alleges that in order for a person to "create a Pinterest account, a person must provide their first and last name, age, gender (optional), email address, country, region, and preferred language."  *See* ECF No. 13, ¶ 108.  The Complaint further alleges that "Pinterest assigns each accountholder with a user ID ("uid"), which is found in the "s_a" cookie that is an encrypted value identifying only one particular person's

---

[7]     On December 26, 2024, Plaintiff served a subpoena on Google requesting that it produce "all Communications . . . relating to Google Analytics embedded on the Websites, including Communications describing what information would be or has been transmitted to Google by Defendant or via Google Analytics embedded on the Websites." Should this Court disagree with the *Yershov* decision and the sufficiency of the allegations within the Complaint, Plaintiff respectfully requests leave to amend her complaint with information obtained from Google in response to the third-party subpoena.

Pinterest account as they navigate non-Pinterest websites, similar to Meta's FID." *See id*. Unlike *Triller,* Plaintiff alleges automatic linking of Pinterest's stored cookie value to the information found on one's Pinterest profile. *See id*. The Complaint further connects the Pinterest disclosure to Plaintiff's experience by alleging that Plaintiff had a Pinterest account, corresponding Pinterest profile, unique identifiers associated with the same, and that "[w]hen Plaintiff purchased prerecorded video material from Defendant on its website, Defendant separately disclosed . . . Plaintiff's Pinterest 'uid' directly associated with her Pinterest account." *See id*., ¶¶ 17-18.

Plaintiff's allegations satisfy the *Yershov* standard for PII because the Complaint alleges Defendant's disclosure allowed for direct identification of Plaintiff's Pinterest profile, including her name, age, and email address. *See* ECF No. 13, ¶¶ 17-18, 108. Moreover, the Complaint directly alleges that Pinterest independently creates and associates a cookie value with its users' profiles, and based on Defendant's installation of the Pinterest Tag, Defendant is then able to communicate the exact same cookie value, which is otherwise unknown to Defendant, to Pinterest when customers request or obtain prerecorded video material from Defendant's website. *See id*., ¶ 109. Because the Pinterest UID is not anonymized like Roku devices or the *Triller* UID, it is, therefore, akin to the FID, which courts have overwhelmingly declared constitutes PII. *See*, *e.g.*, *Golden*, 688 F. Supp. 3d at 159 (collecting cases).

Plaintiff's allegations similarly satisfy the *Nickelodeon* standard, though this Court should reject that standard because the Complaint alleges "Pinterest or any ordinary person can identify that user by uid in the s_a cookie or other information disclosed via the Pinterest Tag by simply going to a person's Pinterest profile and right-clicking 'Inspect Source' and cross-referencing the information disclosed against the information in the source." *See* ECF No. 13, ¶ 110.[8]

---

[8]   To the extent page 23 of Defendant's brief can be understood to argue there are uncertainties concerning the information obtained from the "inspect source" feature, such a dispute of fact is inappropriate for resolution at the

In a last-ditch effort to dismiss Plaintiff's claims, however, Defendant principally relies on *Wilson v. Triller, Inc.*, 598 F. Supp. 3d 82, 91 (S.D.N.Y. 2022) for the proposition that an anonymized user ID is insufficient to constitute PII.  Defendant's analogy to *Triller* is patently inapposite because it rests on an overstatement of the discussion and holding in the case.  A more careful reading of the case reveals that the plaintiff in *Triller* alleged that Triller disclosed her anonymized "UID, her country, time zone, the videos she watched or otherwise engaged with, other profile's she viewed, as well as certain other information about her device," to Facebook and Appsflyer as Triller's third-party corporate affiliates.  *See Triller*, 598 F. Supp. 3d at 87.  *Triller* is patently distinguishable.

At the outset, there are at least three distinguishable features about the *Triller* allegations when measured against the allegations in this case.  First, the *Triller* plaintiff alleged that there was a pairing required to connect the disclosed data points with a particular individual.  *See id.* at 92 ("Rather, as alleged, in order to make this association, the third party must "pair" the UID with information from a user's Triller profile page, which may or may not contain various personal information about the user, such as any information included in the 'About Me' page or a URL associated with a photograph of the user.").  Plaintiff here alleges no such hypothetical pairing is required in order to identify the user's Pinterest profile and, thus, the user's identity because Pinterest, through Defendant's installation of the Pinterest Tag, automatically matches the PESI.com user with his or her profile when Defendant's site is visited by accessing the user's stored computer cookie data.

---

pleading stage and should be reserved for a later stage in litigation as was the case in the *Martinez* case that Defendant cited within this section. As discussed supra, *Solomon* and *Ghanaat* are plainly distinguishable and did not involve Pinterest allegations.

Second, *Triller* has been abrogated to the extent that even discusses "personally identifiable information" as defined by the VPPA.  Specifically, in *Triller*, the court found that as "a matter of statutory interpretation, it appears that the narrower definition [of PII] is the correct one."  *See Triller*, 598 F. Supp. 3d at 92.  However, in *Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 549 n.10 (2d Cir. 2024), the Second Circuit rejected the notion that the VPPA's definition of "personally identifiable information" is narrow when it engaged in its own statutory construction of the VPPA's provisions. Instead, it found that Congress intended for the term "personally identifiable information" to be broad.  Thus, the only vestige remaining from *Triller* is that the plaintiff in that case failed to plead PII from anonymized data, which is not the case before this Court.  Therefore *Triller* is inapposite and should be completely disregarded.  Third, the *Triller* plaintiff alleged Facebook and Appsflyer were Triller's third-party corporate affiliates, which necessarily triggered the ordinary course of business exception of the VPPA.  *See Triller,* 598 F. Supp. 3d at 87.  These differences render *Triller* inapposite to the case before the Court.

The Complaint sufficiently alleges Defendant disclosed her PII to Pinterest.  Because Count IV is plausibly alleged, Defendant's Motion should be denied.[9]


Dated:  January 21, 2025                          Respectfully submitted,

                                                  By: *s/ Elliot O. Jackson*
                                                      Elliot Jackson

                                                  **HEDIN LLP**
                                                  1395 Brickell Ave., Suite 610
                                                  Miami, Florida 33131-3302
                                                  Telephone:     (305) 357-2107

---

[9]        On December 24, 2024, Plaintiff served a subpoena on Pinterest requesting that it produce "all Communications . . . relating to the Pinterest Tag embedded on the Websites, including Communications describing what information would be or has been transmitted to Pinterest by Defendant or via The Pinterest Tag embedded on the Websites.." Should this Court disagree with the *Yershov* decision and the sufficiency of the allegations within the Complaint, Plaintiff respectfully requests leave to amend her complaint with information obtained from Pinterest in response to the third-party subpoena.

Facsimile:      (305) 200-8801
Ejackson@hedinllp.com

Frank S. Hedin
**HEDIN LLP**
1395 Brickell Ave., Suite 610
Miami, Florida 33131-3302
Telephone:      (305) 357-2107
Facsimile:      (305) 200-8801
fhedin@hedinllp.com