UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

DANA MANZA, individually and on behalf
of all others similarly situated,

      Case No.:  3:24-cv-000690-amb

      Plaintiff,

v.

PESI, INC.,

      Defendant.

---

### DEFENDANT'S ANSWER TO AMENDED CLASS ACTION COMPLAINT

---

NOW COMES Defendant, PESI, INC., by its attorneys, Hinshaw & Culbertson LLP and for its Answer to Plaintiff's Amended Class Action Complaint, states as follows:

### NATURE OF THE CASE

1.　　Plaintiff brings this action to redress Defendant PESI, Inc.'s ("PESI") practice of selling, renting, transmitting, and/or otherwise disclosing, to various third parties, records containing the personal information (including names and addresses) of each of their customers, along with detailed information revealing the titles and subject matter of the videos and other audiovisual materials purchased by each customer (collectively "Personal Viewing Information") in violation of the Video Privacy Protection Act, 18 U.S.C. § 2710 et seq. ("VPPA").

**ANSWER:**　　Defendant admits that Plaintiff bring this action under the Video Privacy Protection Act, 18 U.S.C. § 2710 et seq. ("VPPA"). Defendant denies that it violated the VPPA, denies that it is liable to Plaintiff in any way, and denies the remaining allegations in this paragraph.

2.　　Defendant violated the VPPA with respect to its disclosure of Plaintiff's and Class members' Personal Viewing Information in two ways.

**ANSWER:**　　Defendant denies the allegations in this paragraph.

3.    First, Defendant disclosed its customers' Personal Viewing Information to various third-party recipients, which then appended that information to a myriad of other categories of personal and demographic data pertaining to those customers. Defendant re-sells that Personal Viewing Information (with the appended demographic information) to other third parties on the open market.

**ANSWER:**    Defendant denies that it "disclosed its customers' Personal Viewing Information to various third-party recipients" and denies that it "re-sells that Personal Viewing Information (with the appended demographic information) to other third parties on the open market." Upon reasonable inquiry, Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.

4.    Second, Defendant systematically transmitted (and continues to transmit today) its customers' personally identifying video purchase information to third parties, such as Meta Platforms, Inc. ("Meta"), Alphabet, Inc. f/k/a Google ("Google"), and Pinterest, Inc. ("Pinterest") using snippets of programming code (collectively, "Tracking Technologies"). The programming code for Meta is called the "Meta Pixel," which Defendant chose to install on its www.pesi.com website (the "Website"). Defendant's website uses "Google Analytics" technology and the programming code for that technology is the "Google Tag Manager,"[1] which Defendant chose to integrate and install on its website (hereinafter, "Google Analytics"). The programming code for Pinterest is called the "Pinterest Tag," which Defendant chose to install on its website.

**ANSWER:**    Defendant admits that it chose to install the Meta Pixel, Google Analytics, and the Pinterest Tag on its website, www.pesi.com, but denies any wrongdoing by its actions.

---

[1] Google Developers, About Google Tag Manager, https://developers.google.com/tagplatform/tag-manager (last visited Oct. 2, 2024).

07791\324881518.v3

Defendant admits that the Tracking Technologies can cause the transmission of some information between Defendant's website and Meta, Google, and Pinterest, respectively, but any transmission is dependent on or impacted by a variety of factors, including but not limited to whether the user had a Meta account, was logged into that account, what browser they used, the device they used, and the privacy settings enabled. Defendant denies that is "systematically transmitted (and continued to transmit today) its customers' personally identifying video purchase information to third parties." Upon reasonable inquiry, Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.

5.     The information Defendant disclosed (and continues to disclose) to Meta via the Meta Pixel includes the customer's Facebook ID ("FID") and the subscription that each of its customers purchased on its Website. An FID is a unique sequence of numbers linked to a specific Meta profile. A Meta profile, in turn, identifies by name the specific person to whom the profile belongs (and also contains other personally identifying information about the person). Entering "Facebook.com/[FID]" into a web browser returns the Meta profile of the person to whom the FID corresponds. Thus, the FID identifies a person more precisely than a name, as numerous persons may share the same name, but each person's Facebook profile (and associated FID) uniquely identifies one and only one person. In the simplest terms, the Meta Pixel installed by Defendant captures and discloses to Meta information that reveals a particular person purchased prerecorded video to access prerecorded video content from Defendant's Website, information which is hereinafter, referred to as "Personal Viewing Information."

**ANSWER:**     Defendants denies that it "disclosed (and continues to disclose)" to Meta "the customer's Facebook ID ('FID') and the subscription that each of its customers purchased on its Website." Defendant denies that "[a] Meta profile, in turn, identifies by name the specific person

3

to whom the profile belongs (and also contains other personally identifying information about the person)." Defendant denies that "the FID identifies a person more precisely than a name." Defendant denies that "each person's Facebook profile (and associated FID) uniquely identifies one and only one person." Defendant denies that an FID necessarily "corresponds" to a person. Defendant admits that "Entering 'Facebook.com/[FID]' into a web browser" can return the corresponding Meta profile if the profile is public. Defendant admits that it installed the Meta Pixel on its website but denies any wrongdoing by its actions. Defendant admits that the Meta Pixel can cause the transmission of information between its website and Meta, but any transmission is dependent on or impacted by a variety of factors, including but not limited to whether the user had a Meta account, was logged into that account, what browser they used, the device they used, and the privacy settings enabled. Accordingly, upon reasonable inquiry, Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.

6.      Similarly, Google Analytics and the Pinterest Tag were intentionally installed by Defendant on its Website. The information Defendant disclosed (and continues to disclose) to Google Analytics via the Google Tag Manager it installed on its website includes the specific video title and unique user data sufficient for identification of the subscriber.

**ANSWER:**    Defendant admits that it installed Google Analytics and the Pinterest Tag on its website but denies any wrongdoing by its actions. Defendant denies the remaining allegations in this paragraph.

7.      The information Defendant disclosed (and continues to disclose) to Pinterest via the Pinterest Tag it installed on its website includes the specific video title alongside Pinterest accountholder's "user id" ("uid"), which can be used to identify the particular user.

4

**ANSWER:**    Defendant denies the allegations in this paragraph.

8.    Defendant disclosed, continues to disclose, and allows for the surreptitious collection of its customers' Personal Viewing Information to these third parties without asking for, let alone obtaining, their consent to these practices.

**ANSWER:**    Defendant denies the allegations in this paragraph.

9.    The VPPA clearly prohibits what Defendant has done. Subsection (b)(1) of the VPPA provides that, absent the consumer's prior informed, written consent, any "video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person for," 18 U.S.C. § 2710(b)(1), damages in the amount of $2,500.00, see id. § 2710(c).

**ANSWER:**    Defendants admit that "Subsection (b)(1) of the VPPA provides that, absent the consumer's prior informed, written consent, any "video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person for," 18 U.S.C. § 2710(b)(1), damages in the amount of $2,500.00, see id. § 2710(c)" purports to cite to statutory law but denies that the allegations accurately characterize the law when considered as a whole. Defendant denies the remaining allegations of this paragraph.

10.    Thus, while Defendant profits handsomely from their unauthorized disclosures of their customers' Personal Viewing Information to third parties without providing prior notice to or obtaining the requisite consent from any of these customers, they do so at the expense of their customers' privacy and their statutory rights under federal law.

**ANSWER:**    Defendant denies the allegations in this paragraph.

11.    Defendant's practice of disclosing its customers' Personal Viewing Information in

violation of the VPPA has invaded Plaintiff's and the other unnamed Class members' privacy and resulted in a barrage of unwanted junk mail to their home addresses and e-mail inboxes. Defendant's disclosure is also dangerous because it allows for the targeting of particularly vulnerable members of society. For example, and as a result of Defendant's disclosure of Personal Viewing Information, any person or entity could buy a list with the names and addresses of all women residing in a particular state who have purchased and attended mental health or healthcare nursing seminars on a specified topic during the past 12 months. Such lists are available for sale for approximately $155.00 and $180.00 per thousand customers listed.

**ANSWER:**    Defendant denies the allegations in this paragraph.

12.    In an era when the collection and monetization of consumer data proliferate on an unprecedented scale, it is important that companies are held accountable for the exploitation of their customers' sensitive information. Defendant chose to disregard Plaintiff's and thousands of other consumers' statutorily protected privacy rights by (a) releasing their Personal Viewing Information into the data aggregation and brokerage marketplace and (b) directly disseminating such information from its websites to Meta, Google, and Pinterest via Tracking Technologies. Accordingly, on behalf of herself and the putative Classes defined below, Plaintiff brings this Amended Class Action Complaint against Defendant for intentionally and unlawfully disclosing her and the Classes' Personal Viewing Information.

**ANSWER:**    Defendant denies that it "chose to disregard Plaintiff's and thousands of other consumers' statutorily protected privacy rights by (a) releasing their Personal Viewing Information into the data aggregation and brokerage marketplace and (b) directly disseminating such information from its websites to Meta, Google, and Pinterest via Tracking Technologies." Defendant denies that class relief is appropriate and denies that it "intentionally and unlawfully

6

disclos[ed] her and the Classes' Personal Viewing Information." Upon reasonable inquiry, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

**PARTIES**

**I.       PLAINTIFF DANA MANZA**

13.       Plaintiff is, and at all times relevant hereto was, a citizen and resident of Nassau County, New York.

**ANSWER:**    Upon reasonable inquiry, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

14.       Plaintiff is, and at all times relevant hereto was, a user of Meta.

**ANSWER:**    Upon reasonable inquiry, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

15.       Plaintiff is a consumer of the video products and services offered on Defendant's www.pesi.com website. Including on or about January 3, 2023, Plaintiff purchased prerecorded video material from Defendant's website by requesting and paying for such material, providing her name, email address, and home address for delivery of such material. Defendant completed its sales of goods to Plaintiff by delivering the prerecorded video material she purchased to the address she provided in her order. Accordingly, Plaintiff requested or obtained, and is therefore a consumer of, prerecorded video material sold by Defendant on its website.

**ANSWER:**    Defendant admits that a PESI account associated with Plaintiff's business purchased prerecorded video material from Defendant's website on or about January 3, 2023, by requesting and paying for such material, providing Plaintiff's name. Defendant denies that Plaintiff's personal email address and home address were provided for the delivery of such material. Defendant denies that it "deliver[ed] the prerecorded video material she purchased to the

7

address she provided in her order" because the prerecorded video material was accessible through PESI's website via the PESI account associated with Plaintiff's business. Defendant denies the remaining allegations in this paragraph.

16.    At all times relevant hereto, including when purchasing, requesting, and obtaining the prerecorded video material from Defendant's website, Plaintiff had a Meta account, a Meta profile, and an FID associated with such profile.

**ANSWER:**    Upon reasonable inquiry, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

17.    At all times relevant hereto, including when purchasing, requesting, and obtaining the prerecorded video material from Defendant's website, Plaintiff had Google and Pinterest accounts, corresponding profiles, and unique identifiers associated with such profiles.

**ANSWER:**    Upon reasonable inquiry, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

18.    When Plaintiff purchased prerecorded video material from Defendant on its website, Defendant separately disclosed Plaintiff's FID, Plaintiff's Pinterest "uid" directly associated with her Pinterest account, and excessive amounts of device and uniquely identifiable data points about Plaintiff to Google Analytics coupled with the specific title of the prerecorded video or video materials she purchased (as well as the URL where such video is available for purchase), among other information concerning Plaintiff and the device on which she used to make the purchase (the purchaser's unique IP address, browser description, device name and type, and geolocation information).

**ANSWER:**    Defendant denies the allegations in this paragraph.

19.    To illustrate Defendant's disclosure to Meta, when Plaintiff purchased the

"Integrative Sex and Couples Certification Training with Tammy Nelson: Certified Sex Therapy Informed Professional (CSTIP)" course, the specific title of the prerecorded video, the product code: 001608, and her request to "go to checkout" to complete her purchase was transmitted to Meta alongside Plaintiff's FID as seen in the exemplar source code below obtained by Counsel below:

| ▼ General | |
|---|---|
| Request URL: | https://www.facebook.com/privacy_sandbox/pixel/register/trigger/?id=1605037483099710&ev=SubscribedButtonClick&dl=https%3A%2F%2Fcatalog.pesi.com%2Fshoppingcart&rl=https%3A%2F%2Fcatalog.pesi.com%2Fsales%2Fbh_c_001608_integrativesexcouplescertification_organic-404417&if=false&ts=1727449144780&cd[buttonFeatures]=%7B%22classList%22%3A%22pull-right%20btn%20btn-primary%20ce21_cart_clsProceedToCart%20clsProceedToCart%22%2C%22destination%22%3A%22javascript%3Avoid(0)%3B%22%2C%22id%22%3A%22btnProceedToCheckout%22%2C%22imageUrl%22%3A%22linear-gradient(rgb(51%2C%20122%2C%20183)%200%25%2C%20rgb(38%2C%2090%2C%20136)%20100%25)%22%2C%22innerText%22%3A%22Proceed%20to%20checkout%22%2C%22numChildButtons%22%3A0%2C%22tag%22%3A%22a%22%2C%22type%22%3Anull%2C%22name%22%3A%22%22%7D&cd[buttonText]=Proceed%20to%20checkout&cd[formFeatures]=%5B%5D&cd[pageFeatures]=%7B%22title%22%3A%22Shopping%20Cart%20%7C%20PESI.com%22%7D&sw=3008&sh=1692&v=2.9.168&r=stable&ec=1&o=4126&fbp=fb.1.1726589158520.397865688563904186&ler=other&cdl=API_unavailable&it=1727449139766&coo=false&es=automatic&tm=3&rqm=FGET |
| Request Method: | GET |
| Status Code: | 🟢 200 OK |
| Remote Address: | 31.13.67.35:443 |
| Referrer Policy: | strict-origin-when-cross-origin |

**ANSWER:**     Defendant denies the allegations in this paragraph.

20.     To illustrate Defendant's disclosure to Google Analytics, when Plaintiff made her purchase, her request or initiation of the purchase, the title of the prerecorded video content to be purchased, and the prerecorded video content's product number were transmitted to Google

Analytics alongside Plaintiff's unique device identifiers (including cid,[2] uid,[3] and NID[4]) as seen

in the exemplar source code obtained by Counsel below:

| ▼ Request Headers | |
|---|---|
| :authority: | www.google.com |
| :method: | GET |
| :path: | /pagead/1p-user-list/877718457/?random=1727454316557&cv=11&fst=1727452800000&bg=ffffff&guid=ON&async=1&gtm=45je49p0v872775561z872104490za200zb72104490&gcd=13l3l3l3l1l1&dma=0&tag_exp=101671035~101747727&u_w=3008&u_h=1692&url=https%3A%2F%2Fcatalog.pesi.com%2Fshoppingcart&ref=https%3A%2F%2Fcatalog.pesi.com%2Fsales%2Fbh_c_001608_integrativesexcouplescertification_organic-404417&hn=www.googleadservices.com&frm=0&tiba=Shopping%20Cart%20%7C%20PESI.com&npa=0&pscdl=noapi&auid=2069447533.1726589158&uaa=arm&uab=64&uafvl=Chromium%3B128.0.6613.139%7CNot%253BA%253DBrand%3B24.0.0.0%7CGoogle%2520Chrome%3B128.0.6613.139&uamb=0&uam=&uap=macOS&uapv=14.5.0&uaw=0&fledge=1&data=event%3Dgtag.config&rfmt=3&fmt=3&is_vtc=1&cid=CAQSKQDpaXnfUGOjPcZLNDRU5wb2f3B7s2peKlOYaTe75iRU85ux1tr94rjc&random=1340292074&rmt_tld=0&ipr=y |
| :scheme: | https |
| Accept: | image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8 |
| Accept-Encoding: | gzip, deflate, br, zstd |
| Accept-Language: | en-US,en;q=0.9 |
| Cookie: | __Secure-3PSID=g.a000oAijefLf5vQwittvnZvr69Q05ruzIMtAP6LZt_79MvwgxGCuYXL25vpYY_AsTvKh1TIgJgACgYKAQ4SARESFQHGX2MiCY9emM202jqeinlz-oflqRoVAUF8yKrV6bnH5uKOGFvymK_cYnBG0076; __Secure-3PAPISID=kxJ-Z8bQoZxQCxdP/APnz71wo2CfQSS_F8; NID=517=v_wdHz3adxRYvj621yF2-GpP31JOs6h6lMnvrlBSbb7j37GgUEc6fkOSEh1lSbPevdhgWYM08w7HMhuJQPOodvIrprJQwSCedxl_dHriF7rLlp4LSKbsoU5rJQo11B9N5rtV96pSqnaO0063gdzP3DytkU5WM5d7MGY1gfUYoudwMgM |

---

[2] Google Analytics *Help, [GA4] Data collection*, https://support.google.com/analytics/answer/11593727?hl=en (last visited Sept. 28, 2024) ("Google Analytics stores a client ID in a first-party cookie named _ga to distinguish unique users and their sessions on your website. ").

[3] Google Analytics Help, *User-ID Feature*, https://support.google.com/analytics/answer/3123662#zippy=%2Cin-this-article (last visited Sept. 28, 2024) ("User-ID lets you associate a persistent ID for a single user with that user's engagement data from one or more sessions initiated from one or more devices . . . User-ID enables the association of one or more sessions (and the activity within those sessions) with a unique and persistent ID that you send to Analytics.").

[4] Google, *How Google uses cookies*, https://policies.google.com/technologies/cookies (last visited Sept. 28, 2024) ("The 'NID' cookie is used to show Google ads in Google services for *signed-out users*") (emphasis added).

07791\324881518.v3

**ANSWER:**    Defendant denies the allegations in this paragraph.

21.    The same information within the request headers seen above that was sent to Google Analytics was sent to "Google Adsense" and "Google Leads" in the source code when Plaintiff made her purchase.

**ANSWER:**    Defendant denies the allegations in this paragraph.

22.    To illustrate Defendant's disclosure to Pinterest, when Plaintiff made her purchase, her request or initiation of the purchase – "add to cart event", order quantity, the title of the prerecorded video content to be purchased, product category, and the prerecorded video content's product number and price were transmitted to the Pinterest alongside Plaintiff's unique identifiers (s_a value[5]) as seen in the examples obtained by Counsel below:

---

[5] Pinterest uses a "s_a" cookie that contains an encrypted string of letters, numbers, and characters. The s_a cookie identifies users across devices and webpages because the value is the same whether a person is on their Pinterest account or a webpage with the Pinterest Tag enabled.

07791\324881518.v3

| | |
|---|---|
| Request URL: | https://ct.pinterest.com/v3/?event=addtocart&ed=%7B%22product_name%22%3A%22Integrative%20Sex%20and%20Couples%20Certification%20Training%20with%20Tammy%20Nelson%3A%20Certified%20Sex%20Therapy%20Informed%20Professional%20(CSTIP)%20Course%22%2C%22product_price%22%3A1319.81%2C%22np%22%3A%22gtm%22%2C%22order_quantity%22%3A1%2C%22value%22%3A725.9%2C%22currency%22%3A%22USD%22%2C%22line_items%22%3A%5B%7B%22product_id%22%3A%22106648%22%2C%22product_category%22%3A%22Online%20Course%22%7D%5D%2C%22event_id%22%3A%223b2f4e27-982b-4d06-b784-a66d2f58dc9e%22%7D&tid=2613831277235&pd=%7B%22np%22%3A%22gtm%22%2C%22pin_unauth%22%3A%22dWlkPVpUSTJaREV4WmpndFpESTNaaTAwWlRGaUxUUazVPREV0Wm1SaFFl6QTNNNRFV5TnpBMA%22%2C%22derived_epik%22%3A%22dj0yJnU9SURaV3lCNHIxdm1XSzgzYlhxSjNDRWRFUVR2LUpSbWwmbj04WWRRySXJCS25wZnk3V1ZoR0stzZUtBJm09MSZ0PUFBQUFBR2lyMjZZJZFJnJtPTEmcnQ9QUFBQUFFHYjlyNkUmc3A9NQ%22%2C%22aem_fn%22%3A%22ce375f9c38ced0ab298c9b4360ea4013c911eafce3c98bab9f89f23f98e0f012%22%2C%22aem_eligible_list%22%3A%5B%22fn%22%5D%7D&ad=%7B%22loc%22%3A%22https%3A%2F%2Fcatalog.pesi.com%2Fsales%2Fbh_c_001608_integrativesexcouplescertification_organic-404417%22%2C%22ref%22%3A%22https%3A%2F%2Fwww.google.com%2F%22%2C%22if%22%3Afalse%2C%22sh%22%3A1692%2C%22sw%22%3A3008%2C%22mh%22%3A%22297c41ef3%22%2C%22is_eu%22%3Afalse%2C%22epikDataSource%22%3Anull%2C%22derivedEpikDataSource%22%3A%22fpc_ls%22%2C%22unauthIdDataSource%22%3A%22fpc_ls%22%2C%22architecture%22%3A%22arm%22%2C%22bitness%22%3A%2264%22%2C%22brands%22%3A%5B%7B%22brand%22%3A%22Chromium%22%2C%22version%22%3A%22128%22%7D%2C%7B%22brand%22%3A%22Not%3BA%3DBrand%22%2C%22version%22%3A%224%22%7D%2C%7B%22brand%22%3A%22Google%20Chrome%22%2C%22version%22%3A%22128%22%7D%5D%2C%22mobile%22%3Afalse%2C%22model%22%3A%22%22%2C%22platform%22%3A%22macOS%22%2C%22platformVersion%22%3A%2214.5.0%22%2C%22uaFullVersion%22%3A%22128.0.6613.139%22%2C%22ecm_enabled%22%3Atrue%7D&cb=1727454132498&dbgppce=true |
| Request Method: | GET |
| Status Code: | 🟢 200 OK |
| Remote Address: | 151.101.192.84:443 |
| Referrer Policy: | strict-origin-when-cross-origin |

12

07791\324881518.v3

s_a=YkNEa3Y4ZmYrOW1xNXl5Z0RTOVVaSFZmV0hYTlZpcVZlY0
1UXlndVVrTExpdGpwQVBaRU1oUG4yM2thWFh0RjRvV3RyTWJh
zUxWHpMbXhhY3R0bjhPRmtJdTFTUnlxZTJFSFhSNFpWUmNLV
s3WjBaNUpYS2N0Qjl4ZzR3RTlSQVF0bGJKZ3NRRUVUaEJTam4
eUtWMWdlY1ZYdHZVc25TWEZqMHVSdDZTTVNuMnExUzdFaEF
HRoZ0FGZHV2cDJpS2lLYTRqbXZXU3FoQTkwYkwwOHJoTUIlVk
OMnM1RGx2SjY0c0lPemZKL3RYVkgydmRFKzZwSHowanRGOFZ
RU5oMWorMWkzaVkyQy8wNnlaSFZJZWZSZnY5ZFgza2RYVS9l
UlIZoL281ZDNsb29tNWI4MzdKdmJOUUVzN0N4UEt5MzhMWW1
YlVZbGZRbmtEbkVlK054R0pCN1VGLzJlL090c1RaSU9EMDVYcH
wOHlyOVNUOTZadWk5TEJ1djc2KzQrUm1xL3ZDTlZLQzc5OXds
XNVNU5QbER2OGtSQzA5SGtaRWpEU09kT1RhMDJnS0UyMHU
zJHQ0puSW5RZ005a0FpVlRrMTBiVDBhZ0VSSnc1MEhVK2NEQ
JUMDV5T2E5WGJCMkd2R2p3SmFmOFc4aXV2bFVXbkYzd2h6e
c4YVgzMmpKcXJXYmVHRTdsZ29PdE1ocUF0eWJDaExsZlRpeml
SGFQU2pBeS9UbmE3QUJOajh0ajVqL2g0TVcwVTJBRXFFvL0RxV
hHVzcvWTNlYjRUVXpJUnlpNDBSQVU4VitqN09IdG1kWTVNcEJl
UUJTR3dEczJrVTgzVUplV1RZVjgyb0t2Y0l4SUJNQW1aenBBd21
cm55RzZxc002d0c3TnVxckwrV0FZeE9aZ3JkY3h4ZWNNTEhYK
0rZ1g2YUtPYUp5Yi9Wa2puR3JCCUnd1bUN3ay9OOWVGVWJwT1
BOEhRdmN0a1lqS2t6YlUxSitPUW9uaDBBJLzdsVXpMOXhmcUx5e
UJ2azA4NHA3amw2UENPUjcwN1Z5bGFFZFNwQm9kOTc1ZHV4
ElHY2NTek9FQ2FxZzl1L0xNL1hqdm5mcjVYWjRQKzNlcTE2MGxl
VzZnVU1DdFQvYnFUS0tDbVh1RVgyZWNxek5BSEZ5TUVYMmtjZ
U4cU9Zd2pQRG9jaXE3L1pwT3JwaGGxGWjlzMEthcU9qU3ZqY0p
FQ0Skd3VEJZVmxnSkQ4L2lraUkwV21rbTlRcjdVcGgrMUVwQitS
BqNG5xeTJ6cFRqSWhnT1BhekFPZm5NZW8zcWJZT1FZcDhzW1
mZ01YQk9yyT2NwVXhhSmErRDVWNjhiS2lzNjV3PQ==;
_pinterest_ct_ua="TWc9PSZUa1BWQWhNdmdvOVFTcng0NjJxa
TOUUrQ2JHMFlXUkdrd21aTENBaUNTb1UvME83TzhKUEZ3YUE!
WUvUHFiZDlWWUdDWUl4c1VVSWFCCRUFjenc2N3p3dUsranBFZ
RMSjlKVW1YSlhSMD0mSmh1VTJFZ1FGUlhzbVlxY3VkU2YwT3Zl
SmRzPQ==";

**ANSWER:**    Defendant denies the allegations in this paragraph.

23.    Prior to and at the time she purchased prerecorded video material from Defendant, Defendant did not notify Plaintiff that it would disclose the Personal Viewing Information of its customers generally or that of Plaintiff in particular, and Plaintiff has never consented, agreed,

07791\324881518.v3

authorized, or otherwise permitted Defendant to disclose her Personal Viewing Information to third parties. Plaintiff has never been provided any written notice that Defendant sells, rents, licenses, exchanges, or otherwise discloses its customers' Personal Viewing Information, or any means of opting out of such disclosures of her Personal Viewing Information.

**ANSWER:**    Defendant denies the allegations in this paragraph.

24.    Defendant nonetheless sold, rented, transmitted and/or otherwise disclosed, either directly or through an intermediary or intermediaries, Plaintiff's Personal Viewing Information to data miners, data appenders, data aggregators, marketing companies, and/or other third parties, including without limitation NextMark, during the relevant time period.

**ANSWER:**    Defendant denies the allegations in this paragraph.

25.    Plaintiff has never consented, agreed, authorized, or otherwise permitted Defendant to disclose her Personal Viewing Information to third parties. In fact, Defendant has never even provided Plaintiff with written notice of its practices of disclosing its customers' Personal Viewing Information to third parties.

**ANSWER:**    Defendant denies the allegations in this paragraph.

26.    Because Defendant disclosed Plaintiff's Personal Viewing Information (including her FID, unique identifiers, and her purchase of prerecorded video material to Defendant's website) to third parties during the applicable statutory period, Defendant violated Plaintiff's rights under the VPPA and invaded her statutorily conferred interest in keeping such information (which bears on her personal affairs and concerns) private.

**ANSWER:**    Defendant denies the allegations in this paragraph.

**II.    Defendant PESI, Inc.**

27.    Defendant is a non-stock corporation existing under the laws of the State of

07791\324881518.v3

Wisconsin with a principal place of business at 3839 White Ave., Eau Claire, WI 54703. Defendant operates and maintains the Website www.pesi.com, where it carries out its mission and most significant activity which is to provide education and training to healthcare professionals, counseling professionals, and the general public through the sale and delivery of prerecorded video content including: conferences, seminars, workshops, online/on-demand courses, CDs and DVDs on various topics.

**ANSWER:**     Defendant admits that it "is a non-stock corporation existing under the laws of the State of Wisconsin with a principal place of business at 3839 White Ave., Eau Claire, WI 54703" and that it "operates and maintains the Website www.pesi.com." Defendant admits that part of its mission is to "provide education and training to healthcare professionals, counseling professionals, and the general public," and that it offers content including "conferences, seminars, workshops, online/on-demanded courses, CDs and DVDs on various topics." Defendant denies that its "most significant activity" is "the sale and delivery of prerecorded video content" and denies the remaining allegations in this paragraph.

28.     Defendant also utilizes, governs, and maintains a network of affiliates, such as the Psychotherapy Networker and others, to sell its prerecorded video content on their respective websites.[6]

**ANSWER:**     Defendant admits that it has affiliates including the Psychotherapy Networker. Defendant admits some of its affiliates, including the Psychotherapy Networker, sell prerecorded video content on their website. Defendant denies the remaining allegations in this paragraph.

---

[6] Where "Website" is referenced herein, it refers to www.pesi.com and any of Defendant's affiliate websites.

07791\324881518.v3

**JURISDICTION AND VENUE**

29.    The Court has subject-matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 2710.

**ANSWER:**    Subject to its affirmative defenses, Defendant does not contest jurisdiction.

30.    Personal jurisdiction and venue are proper because Defendant maintains its headquarters and principal place of business in Eau Claire, WI, within this judicial District.

**ANSWER:**    Defendant does not contest venue.

**VIDEO PRIVACY PROTECTION ACT**

31.    The VPPA prohibits companies (like Defendant) from knowingly disclosing to third parties (like Meta, Google, and Pinterest) information that personally identifies consumers (like Plaintiff) as having requested or obtained particular videos or other audio-visual materials.

**ANSWER:**    Defendant admits that the allegations in this paragraph purport to summarize statutory law. Defendant denies that the allegations in this paragraph accurately characterize the law when considered as a whole.

32.    Specifically, subject to certain exceptions that do not apply here, the VPPA prohibits "a video tape service provider" from "knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of such provider[.]" 18 U.S.C. § 2710(b)(1). The statute defines a "video tape service provider" as "any person, engaged in the business . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials," 18 U.S.C. § 2710(a)(4). It defines a "consumer" as "a renter, purchaser, or subscriber of goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1). "'[P]ersonally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3).

**ANSWER:**    Defendant admits that the allegations in this paragraph purport to cite to

statutory law. Defendant denies that the allegations in this paragraph accurately characterize the law when considered as a whole.

33.    Leading up to the VPPA's enactment in 1988, members of the United States Senate warned that "[e]very day Americans are forced to provide to businesses and others personal information without having any control over where that information goes." Id. Senators at the time were particularly troubled by disclosures of records that reveal consumers' purchases and rentals of videos and other audiovisual materials because such records offer "a window into our loves, likes, and dislikes," such that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7-8 (1988) (statements of Sens. Simon and Leahy, respectively).

**ANSWER:**    Defendant admits that the allegations in this paragraph purport to cite to legislative history of statutory law. Defendant denies that the allegations in this paragraph accurately characterize the legislative history or the law when considered as a whole. Upon reasonable inquiry, Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.

34.    Thus, in proposing the Video and Library Privacy Protection Act (which later became the VPPA), Senator Patrick J. Leahy (the senior Senator from Vermont from 1975 to 2023) sought to codify, as a matter of law, that "our right to privacy protects the choice of movies that we watch with our family in our own homes." 134 Cong. Rec. S5399 (May 10, 1988). As Senator Leahy explained at the time, the personal nature of such information, and the need to protect it from disclosure, is the raison d'être of the statute: "These activities are at the core of any definition of personhood. They reveal our likes and dislikes, our interests and our whims. They say a great

17

deal about our dreams and ambitions, our fears and our hopes. They reflect our individuality, and they describe us as people." *Id.*

**ANSWER:**  Defendant admits that the allegations in this paragraph purport to cite to legislative history of statutory law. Defendant denies that the allegations in this paragraph accurately characterize the legislative history or the law when considered as a whole.

35.     While these statements rang true in 1988 when the act was passed, the importance of legislation like the VPPA in the modern era of data mining is more pronounced than ever before. During a more recent Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Leahy emphasized the point by stating: "While it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."[7]

**ANSWER:**  Defendant admits that the allegations in this paragraph purport to cite to legislative history of statutory law. Defendant denies that the allegations in this paragraph accurately characterize the legislative history or the law when considered as a whole. Upon reasonable inquiry, Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.

36.     Former Senator Al Franken may have said it best: "If someone wants to share what they watch, I want them to be able to do so . . . But I want to make sure that consumers have the right to easily control who finds out what they watch—and who doesn't. The Video Privacy

---

[7] The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century, Senate Judiciary Committee Subcommittee on Privacy, Technology and the Law, http://www.judiciary.senate.gov/meetings/the-video-privacy-protection-act-protecting-viewer-privacy-in-the-21stcentury.

Protection Act guarantees them that right."[8]

**ANSWER:**    Defendant admits that the allegations in this paragraph purport to cite to legislative history of statutory law. Defendant denies that the allegations in this paragraph accurately characterize the legislative history or the law when considered as a whole. Upon reasonable inquiry, Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.

37.    In this case, however, Defendant deprived Plaintiff and numerous other similarly situated persons of that right by systematically (and surreptitiously) disclosing their Personal Viewing Information to third parties, without providing notice to (let alone obtaining consent from) any of them, as explained in detail below.

**ANSWER:**    Defendant denies the allegations in this paragraph.

## BACKGROUND FACTS

### I.    Consumers' Personal Information Has Real Market Value

38.    In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . . [and] individuals are concerned about being defined by the existing data on themselves."[9]

**ANSWER:**    Upon reasonable inquiry, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

39.    Over two decades later, Commissioner Swindle's comments ring truer than ever,

---

[8] Chairman Franken Holds Hearing on Updated Video Privacy Law for 21st Century, franken.senate.gov (Jan. 31, 2012).
[9] Transcript, *The Information Marketplace* (Mar. 13, 2001), at 8-11, available at https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-mergingand-exchanging-consumer-data/transcript.pdf.

07791\324881518.v3

as consumer data feeds an information marketplace that supports a 26 billion dollar per year online advertising industry in the United States.[10]

**ANSWER:**   Upon reasonable inquiry, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

40.     The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis – and profit.[11]

**ANSWER:**   Upon reasonable inquiry, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

41.     In fact, an entire industry exists while companies known as data aggregators purchase, trade, and collect massive databases of information about consumers. Data aggregators then profit by selling this "extraordinarily intrusive" information in an open and largely unregulated market.[12]

**ANSWER:**   Upon reasonable inquiry, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

42.     The scope of data aggregators' knowledge about consumers is immense: "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation

---

[10] *See* Julia Angwin and Emily Steel, *Web's Hot New Commodity: Privacy*, Wall Street Journal (Feb. 28, 2011), available at https://www.wsj.com/articles/SB10001424052748703529004576160764037920274.
[11]     Statement    of    FTC    Cmr.    Harbour    (Dec.    7,    2009),    at    2,    available    at https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacyroundtable/091207privacyroundtable.pdf
[12] *See* M. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), available at http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ .

07791\324881518.v3

dreams—and on and on."[13]

**ANSWER:**  Upon reasonable inquiry, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

43.  Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available.[14]

**ANSWER:**  Upon reasonable inquiry, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

44.  Recognizing the severe threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-chairmen of the Congressional Bi-Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive collections of consumer data, stating in pertinent part:

> By combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer. This large[-]scale aggregation of the personal information of hundreds of millions of American citizens raises a number of serious privacy concerns.[15]

**ANSWER:**  Upon reasonable inquiry, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

45.  Data aggregation is especially troublesome when consumer information is sold to

---

[13] N. Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), available at https://www.nytimes.com/2012/06/17/technology/acxiom-the-quiet-giant-ofconsumer-databasemarketing.html#:~:text=It's%20called%20the%20Acxiom%20Corporation,to%20know%20much%2C%20much%20more.

[14] Letter from Sen. J. Rockefeller IV, Sen. Cmtee. On Commerce, Science, and Transportation, to S. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) available at https://www.commerce.senate.gov/services/files/3bb94703-5ac8-4157-a97b-%20a658c3c3061c.

[15] *See Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Sen. Markey (July 24, 2012), available at https://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakersquery-data-brokers-about-practices-involving-consumers-personal-information.

direct-mail advertisers. In addition to causing waste and inconvenience, direct-mail advertisers often use consumer information to lure unsuspecting consumers into various scams, including fraudulent sweepstakes, charities, and buying clubs. Thus, when companies like PESI share information with data aggregators, data cooperatives, and direct-mail advertisers, they contribute to the "[v]ast databases" of consumer data that are often "sold to thieves by large publicly traded companies," which "put[s] almost anyone within the reach of fraudulent telemarketers" and other criminals.[16]

**ANSWER:**    Defendant denies any wrongdoing and denies that it "contribute[s] to the '[v]ast databases' of consumer data that are often 'sold to thieves by large publicly traded companies,' which 'put[s] almost everyone within the reach of fraudulent telemarketers' and other criminals." Upon reasonable inquiry, Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.

46.    Disclosures like Defendant's are particularly dangerous to the elderly. "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."[17]

**ANSWER:**    Defendant denies that any of its actions "are particularly dangerous to the elderly." Upon reasonable inquiry, Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.

47.    The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other

---

[16] *See* Charles Duhigg, *Bilking the Elderly, with a Corporate Assist*, N.Y. Times (May 20, 2007), available at https://www.nytimes.com/2007/05/20/business/20tele.html.
[17] *Id.*

07791\324881518.v3

assets to spend on seemingly attractive offers."[18]

**ANSWER:**    Upon reasonable inquiry, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

48.    Indeed, an entire black market exists while the personal information of vulnerable elderly Americans is exchanged. Thus, information disclosures like Defendant's are particularly troublesome because of their cascading nature: "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[19]

**ANSWER:**    Defendant denies any of its actions "are particularly troublesome because of their cascading nature: 'Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists.'" Upon reasonable inquiry, Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.

49.    Defendant is not alone in violating its customers' statutory rights and jeopardizing their well-being in exchange for increased revenue: disclosing customer and subscriber information to data aggregators, data appenders, data cooperatives, direct marketers, and other third parties has become a widespread practice. Unfortunately for consumers, however, this growth has come at the expense of their most basic privacy rights.

**ANSWER:**    Defendant denies that it "violat[ed] its customers' statutory rights and jeopardiz[ed] their well-being in exchange for revenue." Upon reasonable inquiry, Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.

---

[18] Prepared Statement of the FTC on "Fraud Against Seniors" before the Special Committee on Aging, United States Senate (August 10, 2000).
[19] *Id.*

## II.    Consumers Place Monetary Value on Their Privacy and Consider Privacy Practices When Making Purchases

50.    As the data aggregation industry has grown, so has consumer concerns regarding personal information.

**ANSWER:**    Upon reasonable inquiry, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

51.    A survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do protect their privacy online.[20] As a result, 81 percent of smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.[21]

**ANSWER:**    Upon reasonable inquiry, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

52.    Thus, as consumer privacy concerns grow, consumers increasingly incorporate privacy concerns and values into their purchasing decisions, and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy protective competitors. In fact, consumers' personal information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their personal information themselves.[22]

**ANSWER:**    Upon reasonable inquiry, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

---

[20] *See 2014 TRUSTe US Consumer Confidence Privacy Report*, TRUSTe, http://www.theagitator.net/wp-content/uploads/012714_ConsumerConfidenceReport_US1.pdf.
[21] *Id*.
[22] *See* Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), available at https://www.nytimes.com/2012/02/13/technology/startups-aim-to-help-users-put-a-price-on-their-personal-data.html.

07791\324881518.v3

53.     These companies' business models capitalize on a fundamental tenet underlying the personal information marketplace: consumers recognize the economic value of their private data. Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their personal data.[23]

**ANSWER:**    Upon reasonable inquiry, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

54.     Thus, in today's digital economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[24] As such, where a business offers customers a product or service that includes statutorily guaranteed privacy protections, yet fails to honor these guarantees, the customer receives a product or service of less value than the product or service paid for.

**ANSWER:**    Upon reasonable inquiry, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

### III.    Defendant Unlawfully Sells, Rents, Transmits, And Otherwise Discloses Its Customers' Personal Viewing Information

55.     Defendant maintains vast digital databases comprised of its customers' Personal Viewing Information, including the names and addresses of each customer and information reflecting the titles of specific videos and other audio-visual products that each of its customers has purchased.

**ANSWER:**    Defendant admits that it maintains information pertaining to its customers,

---

[23] *See* Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011); *see also* European Network and Information Security Agency, *Study on Monetizing Privacy* (Feb. 27, 2012), available at https://www.enisa.europa.eu/publications/monetising-privacy.
[24] *See* Hann, et al., *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, available at https://www.comp.nus.edu.sg/~ipng/research/privacy.pdf.

07791\324881518.v3

including the names and addresses provided by the customers and purchase history information, which includes the titles of specific videos and other products. Defendant denies the remaining allegations in this paragraph.

56.     During the time period relevant to this action, Defendant has monetized these databases by renting, selling, or otherwise disclosing their customers' Personal Viewing Information to data aggregators, data miners, data brokers, data appenders, and other third parties.

**ANSWER:**     Defendant denies the allegations in this paragraph.

57.     These factual allegations are corroborated by two pieces of publicly available evidence. For instance, as shown in the screenshot below, the Personal Viewing Information of 303,967 American consumers who purchased Defendant's video products, including healthcare nursing seminars, is offered for sale on the website of NextMark, Inc. ("NextMark") – one of many traffickers of this type of Personal Viewing Information – at a base price of "$130.00/M [per thousand records]" (13.0 cents each):

07791\324881518.v3



*See* **Exhibit A** hereto.

**ANSWER:**    Defendant denies that "[t]hese factual allegations are corroborated by" the attached screenshot. Defendant denies that the screenshot shows that "the Personal Viewing Information of 303,967 American consumers who purchased Defendant's video products, including healthcare nursing seminars, is offered for sale on the website of NextMark, Inc. ('NextMark')." Upon reasonable inquiry, Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.

07791\324881518.v3

58.    Additionally, as shown in the screenshot below, the Personal Viewing Information of 199,167 American consumers who purchased Defendant's video products, including mental health seminars, is offered for sale on the website of NextMark, Inc. ("NextMark") – one of many traffickers of this type of Personal Viewing Information – at a base price of "$130.00/M [per thousand records]" (13.0 cents each):



*See* **Exhibit B** hereto.

**ANSWER:**    Defendant denies that the screenshot shows that "the Personal Viewing Information of 199,167 American consumers who purchased Defendant's video products, including mental health seminars, is offered for sale on the website of NextMark, Inc.

07791\324881518.v3

('NextMark')." Upon reasonable inquiry, Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.

59.    Defendant's "Healthcare Nursing Seminar Attendees" and "Mental Health Seminar Attendees" lists are offered for sale by NextMark, shown in the screenshots above, collectively contain Personal Viewing Information for each of the 503,134 American consumers whose information appears on the lists, including each person's name, postal address, e-mail address, gender, age, and income, as well as the prerecorded particular audio-visual product(s) they purchased from Defendant (i.e., the titles of the prerecorded videos purchased) and the amount of money they spent on those purchases.

**ANSWER:**    Defendant denies the allegations in this paragraph.

60.    As a result of Defendant's data compiling and sharing practices, companies have obtained and continue to obtain the Personal Viewing Information of Defendant's customers, together with additional sensitive personal information that has been appended thereto by data appenders and others.

**ANSWER:**    Defendant denies the allegations in this paragraph.

61.    Plaintiff is informed and believes, and thereupon alleges, that numerous of the third parties to whom Defendant has transmitted and/or otherwise disclosed their customers' Personal Viewing Information, either directly or indirectly through an intermediary or intermediaries, have in turn sold, rented, transmitted, or otherwise disclosed that Personal Viewing Information (together with other sensitive personal demographic and lifestyle information appended thereto by data appenders and other entities) to other third parties, including other data brokers, data miners, data appenders, and marketing companies.

**ANSWER:**    Upon reasonable inquiry, Defendant lacks knowledge or information

sufficient to form a belief about the truth of the allegations in this paragraph.

62.    Defendant's disclosure of Personal Viewing Information has put its customers at risk of serious harm from scammers. For example, as a result of Defendant's disclosure of Personal Viewing Information, any person or entity could obtain a list with the names and addresses of all women residing in Connecticut who purchased prerecorded healthcare nursing seminars related to children's healthcare from Defendant during the past 12 months. Such a list is available for sale for approximately $180.00 per thousand customers listed.

**ANSWER:**    Defendant denies the allegations in this paragraph.

63.    Additionally, any person or entity could obtain a list with the names and addresses of persons residing in Connecticut who purchased prerecorded mental health seminars related to children's mental health from Defendant during the past 12 months. Such a list is available for sale for approximately $155.00 per thousand customers listed.

**ANSWER:**    Defendant denies the allegations in this paragraph.

64.    Defendant did not seek Plaintiff or any other customers' prior written consent to the disclosure of their Personal Viewing Information (in writing or otherwise) and their customers remain unaware that their Personal Viewing Information and other sensitive data is being sold, rented and exchanged on the open market.

**ANSWER:**    Defendant denies the allegations in this paragraph.

### IV.    Defendant Uses the Meta Pixel to Systematically Disclose its Customers' Personal Viewing Information to Meta

65.    As alleged below and in addition to Defendant's independent practice of transmitting Plaintiff and the Class members' Personal Viewing Information to data brokers and data appenders, when a consumer purchases a specific prerecorded video product from Defendant's website, the Meta Pixel technology that Defendant intentionally installed on its

website transmits the fact that a consumer purchased prerecorded video materials alongside his or her FID to Meta, without the purchaser's consent and in clear violation of the VPPA.

**ANSWER:**    Defendant denies that its conduct violated the VPPA. Defendant denies that it has an "independent practice of transmitting Plaintiff and the Class members' Personal Viewing Information to data brokers and data appenders." Defendant denies that "when a consumer purchases a specific prerecorded video product from Defendant's website, the Meta Pixel technology" "transmits the fact that a consumer purchased prerecorded video materials alongside his or her FID to Meta, without the purchaser's consent and in clear violation of the VPPA." Defendant admits that it installed the Meta Pixel on its website. Defendant admits that the Meta Pixel can cause information to be transmitted, but the transmission is dependent on and/or impacted by a variety of factors, including but not limited to whether the user had a Meta account, was logged into that account, what browser they used, the device they used, and the privacy settings enabled. Accordingly, upon reasonable inquiry, Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.

### A.    The Meta Pixel

66.    On February 4, 2004, Mark Zuckerberg and others launched Facebook, now known as "Meta".[25] Meta is now the world's largest social media platform. To create a Meta account, a person must provide, *inter alia*, his or her first and last name, birth date, gender, and phone number or email address.

**ANSWER:**    Defendant denies that a person must provide their real and actual first and last name, birth date, gender, and phone number or email address to create a Meta account. Upon reasonable inquiry, Defendant lacks knowledge or information sufficient to form a belief about the

---

[25] *See* Facebook, "Company Info," available at https://about.fb.com/company-info./.

truth of the remaining allegations in this paragraph.

67.     The Meta Pixel, first introduced in 2013 as the "Facebook Pixel," is a unique string of code that companies can embed on their websites to monitor and track the actions taken by visitors to their websites and to report them back to Meta. This allows companies like Defendant to build detailed profiles about their customers and to serve them with highly targeted advertising.

**ANSWER:**    Upon reasonable inquiry, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

68.     Additionally, a Meta Pixel installed on a company's website allows Meta to "match [] website visitors to their respective Facebook User accounts."[26] This is because Meta has assigned to each of its users an "FID" number – a unique and persistent identifier that allows anyone to look up the user's unique Meta profile and thus identify the user by name[27] – and because each transmission of information made from a company's website to Meta via the Meta Pixel is accompanied by, inter alia, the FID of the website's visitor. Moreover, the Meta Pixel can follow a consumer to different websites and across the Internet even after the consumer's browser history has been cleared.

**ANSWER:**    Defendant denies that an FID number "allows anyone to look up the user's unique Meta profile and thus identify the user by name." Upon reasonable inquiry, Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.

69.     The Meta Pixel allows online-based companies like Defendant to build detailed

---

[26] Meta, "Get Started – Meta Pixel," available at https://developers.facebook.com/docs/metapixel/get-started/.

[27] For example, Mark Zuckerberg's FID is reportedly the number "4," so logging into Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck, and all of the additional personally identifiable information contained therein.

07791\324881518.v3

profiles about their visitors by collecting information about how they interact with their websites, and to then use the collected information to service highly targeted advertising to them.

**ANSWER:**    Upon reasonable inquiry, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

70.    Additionally, a Meta Pixel installed on a company's website allows Meta "to match . . . website visitors to their respective [Meta] User accounts."[28] Meta is able to do this because it has assigned to each of its users an "FID" number – a unique and persistent identifier that allows anyone to look up the user's unique Meta profile and thus identify the user by name[29] – and because each transmission of information made from a company's website to Meta via the Meta Pixel is accompanied by, inter alia, the FID of the website's visitor.

**ANSWER:**    Defendant denies that an FID number "allows anyone to look up the user's unique Meta profile and thus identify the user by name." Upon reasonable inquiry, Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.

71.    The FID is stored in a small piece of code known as a "cookie" that Meta launches and stores in the internet browsers of each Meta accountholder's device(s) to distinguish between website visitors.[30]

**ANSWER:**    Upon reasonable inquiry, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

---

[28] Meta, *Get Started—Meta Pixel*, https://developers.facebook.com/docs/meta-pixel/get-started/
[29] For example, Mark Zuckerberg's FID is reportedly the number "4," so logging into Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck, and all of the additional personally identifiable information contained therein.
[30]    Meta,    *How    to    Create    a    Custom    Audience    from    Your    Customer    List*, https://www.facebook.com/business/help/471978536642445?id=1205376682832142 (last visited Nov. 11, 2024).

33

72.    As Meta's developer's guide explains, installing the Meta Pixel on a website allows Meta to track actions that users with Meta accounts take on the site. Meta states that "Examples of [these] actions include adding an item to their shopping cart or making a purchase."[31]

**ANSWER:**    Upon reasonable inquiry, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

73.    The default configuration of the Meta Pixel, which is what Defendant used, enables website visitor tracking because the Meta Pixel automatically detects first-party cookie data from the particular website that the visitor is on and then automatically matches it with third-party cookie data from Meta such as the c_user cookie that houses a person's FID.[32]

**ANSWER:**    Defendant admits that, at times, it has used the Meta Pixel. Upon reasonable inquiry, Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.

74.    Meta's Business Tools Terms govern the use of Meta's Business Tools, including the Meta Pixel.[33]

**ANSWER:**    Defendant admits that the allegations in this paragraph purport to cite to Meta's Business Tools Terms. Defendant denies that the allegations in this paragraph accurately characterize Meta's Business Tool Terms when considered as a whole.

75.    Meta's Business Tools Terms state that website operators may use Meta's Business Tools, including the Meta Pixel, to transmit the "Contact Information" and "Event Data" of their website visitors to Meta.

---

[31]    Meta, *About Meta Pixel*, available at https://www.facebook.com/business/help/742478679120153?id=1205376682832142.
[32]    Meta, *Business Help Center: About cookie settings for the Meta Pixel*, FACEBOOK, https://www.facebook.com/business/help/471978536642445?id=1205376682832142 (last visited Nov. 11, 2024).
[33]    Meta, *Meta Business Tools Terms*, available at https://www.facebook.com/legal/technology_terms.

07791\324881518.v3

**ANSWER:**    Defendant admits that the allegations in this paragraph purport to cite to Meta's Business Tools Terms. Defendant denies that the allegations in this paragraph accurately characterize Meta's Business Tool Terms when considered as a whole.

76.    Meta's Business Tools Terms define "Contact Information" as "information that personally identifies individuals, such as names, email addresses, and phone numbers . . . ."[34]

**ANSWER:**    Defendant admits that the allegations in this paragraph purport to cite to Meta's Business Tools Terms. Defendant denies that the allegations in this paragraph accurately characterize Meta's Business Tool Terms when considered as a whole.

77.    Meta's Business Tools Terms state: "You instruct us to process the Contact Information solely to match the Contact Information against user IDs [e.g., FIDs] ("Matched User IDs"), as well as to combine those user IDs with corresponding Event Data."[35]

**ANSWER:**    Defendant admits that the allegations in this paragraph purport to cite to Meta's Business Tools Terms. Defendant denies that the allegations in this paragraph accurately characterize Meta's Business Tool Terms when considered as a whole.

78.    The Business Tools Terms define "Event Data" as, inter alia, "information that you share about people and the actions that they take on your websites and apps or in your shops, such as visits to your sites, installations of your apps, and purchases of your products."[36]

**ANSWER:**    Defendant admits that the allegations in this paragraph purport to cite to Meta's Business Tools Terms. Defendant denies that the allegations in this paragraph accurately characterize Meta's Business Tool Terms when considered as a whole.

79.    Website operators use the Meta Pixel to send information about visitors to their

---

[34] *Id.*
[35] *Id.*
[36] *Id.*

07791\324881518.v3

websites to Meta. Every transmission to Meta accomplished through the Meta Pixel includes at least two elements: (1) the website visitor's FID and (2) the webpage's URL triggering the transmission.

**ANSWER:** Upon reasonable inquiry, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

80.    Depending on the configuration of the Meta Pixel, the website may also send Event Data to Meta. Defendant has configured the Meta Pixel on its websites to send Event Data to Meta, including the page view and purchase events.

**ANSWER:** Defendant admits that, at times, it had configured the Meta Pixel to send some Event Data to Meta, but Defendant denies any wrongdoing by its actions. Upon reasonable inquiry, Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.

81.    When website operators make transmissions to Meta through the Meta Pixel, none of the following categories of information are hashed or encrypted: the visitor's FID, the website URL, or the Event Data.

**ANSWER:** Upon reasonable inquiry, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

82.    Every website operator installing the Meta Pixel must agree to the Meta Business Tools Terms.[37]

**ANSWER:** Upon reasonable inquiry, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

83.    Moreover, the Meta Pixel can follow a consumer to different websites and across

---

[37] *See Id.*

07791\324881518.v3

the Internet even after clearing browser history.

**ANSWER:**    Upon reasonable inquiry, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

84.    Meta has used the Meta Pixel to amass a vast digital database of dossiers comprised of highly detailed personally identifying information about each of its billions of users worldwide, including information about all of its users' interactions with any of the millions of websites across the Internet on which the Meta Pixel is installed. Meta then monetizes this Orwellian database by selling advertisers the ability to serve highly targeted advertisements to the persons whose personal information is contained within it.

**ANSWER:**    Upon reasonable inquiry, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

85.    Simply put, if a company chooses to install the Meta Pixel on its website, both the company who installed it and Meta (the recipient of the information it transmits) are then able to "track [] the people and type of actions they take,"[38] including, as relevant here, the specific prerecorded video material that they purchase on the website.

**ANSWER:**    Upon reasonable inquiry, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

A.    **Defendant Knowingly Uses the Meta Pixel to Transmit the Personal Viewing Information of its Customers to Meta**

86.    Defendant sells a wide variety of prerecorded video materials, including conferences, seminars, workshops, online/on-demand courses, CDs and DVDs on its main website, www.pesi.com, and its network of affiliate websites, which include websites such as

---

[38] Meta, "Retargeting: How to Advertise to Existing Customers with Ads on Facebook," available at https://www.facebook.com/business/goals/retargeting?checkpoint_src=any.

https://www.psychotherapynetworker.org/, and others.

**ANSWER:** Defendant admits that it "sells a wide variety of prerecorded video materials, including conferences, seminars, workshops, online/on-demand courses, CDs and DVDs on its main website, www.pesi.com" and some of its affiliate websites, including on "https://www.psychotherapynetworker.org/." Defendant denies the remaining allegations in this paragraph.

87.    To purchase prerecorded video material from Defendant's Website, a person must provide at least his or her name, email address, billing address, and credit or debit card (or other form of payment) information.

**ANSWER:** Defendant admits that to make a purchase from its website, the purchaser must provide a name, email address, billing address, and payment information. Defendant denies the remaining allegations in this paragraph.

88.    During the purchase process on Defendant's website, Defendant uses – and has used at all times relevant hereto – the Meta Pixel to disclose to Meta the unencrypted FID of the person who made the purchase and the specific title of video material that the person purchased (as well as the URL where such video material is available for purchase).

**ANSWER:** Defendant admits that at times, it used the Meta Pixel on its website, www.pesi.com, during the purchase process. Defendant admits that the Meta Pixel can cause the transmission of some information between Defendant's website and Meta, but that transmission is dependent on or impacted by a variety of factors, including but not limited to whether the user had a Meta account, was logged into that account, what browser they used, the device they used, and the privacy settings enabled. Accordingly, upon reasonable inquiry, Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this

07791\324881518.v3

paragraph.

**ANSWER:**    Defendant denies the remaining allegations in this paragraph.

89.    In order to take advantage of the targeted advertising and other informational and analytical services offered by Meta, Defendant intentionally programmed its website and its affiliates' websites (by following step-by-step instructions from Meta's website) to include the Meta Pixel code, which systematically transmits to Meta the FID of each person with a Meta account who purchases prerecorded video material on one of Defendant's websites, along with the specific title of the prerecorded video material that the person purchased.

**ANSWER:**    Defendant admits that it intentionally programmed the Meta Pixel code on its website and some of its affiliate websites. Upon reasonable inquiry, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegation that Defendant "follow[ed] step-by-step instructions from Meta's website." Defendant denies the remaining allegations in this paragraph.

90.    With only a person's FID and the title of the prerecorded video material (or URL where such material is available for purchase) that the person purchased from Defendant on of its websites—all of which Defendant knowingly and systematically provides to Meta—any ordinary person could learn the identity of the person to whom the FID corresponds and the title of the specific prerecorded video material that the person purchased (and thus requested and obtained). This can be accomplished simply by accessing the URL www.facebook.com/ and inserting the person's FID.

**ANSWER:**    Defendant admits that accessing the URL www.facebook.com/ and inserting an FID can lead a person to a Facebook profile page if the profile page is public. Defendant denies the remaining allegations in this paragraph.

91.    Defendant's practice of disclosing the Personal Viewing Information of its customers to Meta continued unabated for the duration of the two-year period preceding the filing of this action. At all times relevant hereto, whenever Plaintiff or any other person purchased prerecorded video material from Defendant on any of its websites, Defendant disclosed to Meta (inter alia) the specific title of the video material that was purchased (including the URL where such material is available for purchase), along with the FID of the person who purchased it (which, as discussed above, uniquely identified the person).

**ANSWER:**    Defendant denies the allegations in this paragraph.

92.    At all times relevant hereto, Defendant knew the Meta Pixel was disclosing its customers' Personal Viewing Information to Meta.

**ANSWER:**    Defendant denies the allegations in this paragraph.

93.    Although Defendant could easily have programmed its website so that none of its customers' Personal Viewing Information is disclosed to Meta, Defendant instead chose to program its website so that all of its customers' Personal Viewing Information is disclosed to Meta.

**ANSWER:**    Defendant denies the allegations in this paragraph.

94.    Before transmitting its customers' Personal Viewing Information to Meta, Defendant failed to notify any of them that it would do so, and none of them have ever consented (in writing or otherwise) to these practices.

**ANSWER:**    Defendant denies the allegations in this paragraph.

95.    By intentionally disclosing to Meta Plaintiff's and its other customers' FIDs together with the specific video material that they each purchased, without any of their consent to these practices, Defendant knowingly violated the VPPA on an enormous scale.

**ANSWER:**    Defendant denies the allegations in this paragraph.

07791\324881518.v3

V.      **Defendant Uses the Other Tracking Technologies to Systematically Disclose its Customers' Personal Viewing Information to Third Parties**

96.     As alleged below and in addition to Defendant's independent practice of transmitting Plaintiff and the Class members' Personal Viewing Information to data brokers and data appenders, when a consumer purchases a specific prerecorded video product from Defendant's website, the Google and Pinterest technology that Defendant intentionally installed on its website transmit the fact that a consumer purchased prerecorded video materials alongside unique identifiers that identify the purchaser, without the purchaser's consent and in clear violation of the VPPA.

**ANSWER:**     Defendant admits that it installed Google Analytics and the Pinterest Tag on its website. Defendant denies the remaining allegations in this paragraph.

A.      **Google**

97.     Defendant intentionally installed Google Analytics, Google AdSense, and Google Leads extension on its website, which operates in a similar fashion to the Meta Pixel. Specifically, when a person purchases a prerecorded video from Defendant's website, Defendant discloses to Google Analytics, through the operation of the Google Analytics, the user's (i) hashed email address, (ii) Google Analytics client ID, (iii) the title, unique numerical identifier, and URL of the video the user is watching, and (iv) excessive amounts of uniquely identifiable data points, or predefined user dimensions, just short of a person's name that include: age, browser type, city, continent and subcontinent, country, device brand, gender, interests, language, operating system, OS version, IP address, platform, region.[39]

---

[39] Google Analytics Help, *Dimensions and metrics [GA4] Predefined user dimensions signals*, https://support.google.com/analytics/answer/9268042?visit_id=638630753515343005-1876215053&rd=2 (last visited Sept. 28, 2024).

07791\324881518.v3

**ANSWER:**    Defendant denies that it installed Google AdSense and Google Leads extension on its website. Defendant admits that it installed Google Analytics on its website. Defendant admits that Google Analytics can cause the transmission of some information between Defendant's website and Google, dependent on and/or impacted by a variety of factors, including but not limited to whether the user had a Google account, was logged into that account, what browser they used, the device they used, and the privacy settings enabled. Accordingly, upon reasonable inquiry, Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.

98.    When a subscriber to Defendant's website requests or obtains a particular prerecorded video by clicking on it, the title of the prerecorded video content and the prerecorded video content's product number are transmitted to Google Analytics alongside the subscriber's client id ("cid"),[40] hashed email address, NID,[41] IP address, and unique device identifiers. This information can be used by an ordinary person to identify the specific subscriber.

**ANSWER:**    Defendant admits that Google Analytics can cause the transmission of some information between Defendant's website and Google, dependent on or impacted by a variety of factors, including but not limited to whether the user had a Google account, was logged into that account, what browser they used, the device they used, and the privacy settings enabled. Defendant denies that "[t]his information can be used by an ordinary person to identify the specific subscriber." Upon reasonable inquiry, Defendant lacks knowledge or information sufficient to

---

[40] Google Analytics *Help, [GA4] Data collection*, https://support.google.com/analytics/answer/11593727?hl=en (last visited Sept. 28, 2024) ("Google Analytics stores a client ID in a first-party cookie named _ga to distinguish unique users and their sessions on your website.").

[41] Defendant even discloses a unique identifier to Google Analytics for each subscriber who is not signed into their Google account at the time they request or obtain videos from Defendant's website, and that identifier is the NID which directly relates back to one's Google account. *See* Google, *How Google uses cookies*, https://policies.google.com/technologies/cookies (last visited Sept. 28, 2024) ("The 'NID' cookie is used to show Google ads in Google services for *signed-out users*") (emphasis added).

07791\324881518.v3

form a belief about the truth of the remaining allegations in this paragraph.

99.    Specifically, each subscriber to Defendant's website is assigned a "cid" by Defendant and its use of Google technology to distinguish between individual users and their sessions on Defendant's website.

**ANSWER:**    Defendant denies the allegations in this paragraph.

100.    A subscriber's cid and unique id "uid" are also communicated through cookies within that same Google Analytics code. The cookie values are displayed in the developer settings of the browser and reveal the particular cid within the _ga cookie, as seen in the following exemplar:



**ANSWER:**    Upon reasonable inquiry, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

101.    This _ga cookie is comprised of four parts separated by periods: (1) a version number "GA[#]", (2) the number of components at the domain, (3) a unique ID # for the user, and (4) a timestamp of the user's first visit to the site. The last two parts collectively make up the client id.

**ANSWER:**    Upon reasonable inquiry, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

102.    An email address is a personally identifying string of characters that designate an electronic mailbox. Any ordinary person can use an e-mail address to uniquely identify the individual to whom it belongs. Voluminous services exist which enable individuals to look up the

owners of a particular email address.

**ANSWER:**    Defendant admits that an email address is a string of characters that can designate an electronic mailbox. Upon reasonable inquiry, Defendant lacks knowledge or information sufficient to form a belief that "[v]oluminous services exist which enable individuals to look up owners of a particular email address." Defendant denies the remaining allegations in this paragraph.

103.    A "hash" is an algorithm used to create a digital summary, or fingerprint, of the input. However, the Federal Trade Commission has warned companies for over a decade that hashing is an insufficient method of anonymizing information, including as recently as July 24, 2024.[42] Thus, even in hashed form, email addresses are traceable to individuals.

**ANSWER:**    Defendant denies that "even in hashed form, email addresses are traceable to individuals." Upon reasonable inquiry, Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.

104.    The IP addresses transmitted by Defendant to Google Analytics create an approximate map to follow the subscriber across devices and locations. This is because the IP address changes depending on the subscriber's location and device. In the case of Plaintiff, each time they viewed a particular video from Defendant's website, Defendant disclosed their personal IP addresses corresponding to the mobile device or computer used. If Plaintiff used a different device from a different location, Google Analytics received a different IP address, and each IP address remained associated with the individual Plaintiff's pesi.com account, client ID, hashed

---

[42] Ed Felten, *Does Hashing Make Data "Anonymous"?*, Federal Trade Commission (Apr. 22, 2012), available at https://www.ftc.gov/policy/advocacy-research/techatftc/2012/04/does-hashing-make-data-anonymous; Federal Trade Commission, *No, Hashing Still Doesn't Making Your Data Anonymous* (July 24, 2024), available at https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/07/no-hashing-stilldoesnt-make-your-data-anonymous.

email address, and other unique device identifiers disclosed to Google Analytics.

**ANSWER:** Upon reasonable inquiry, Defendant lacks knowledge or information sufficient to form a belief that "the IP address changes depending on the subscriber's location and device," or that "[i]f Plaintiff used a different device from a different location, Google Analytics received a different IP address, and each IP address remained associated with the individual Plaintiff's pesi.com account, client ID, hashed email address, and other unique device identifiers." Defendant denies the remaining allegations in this paragraph.

105.    In sum, as an example of the information disclosed by Defendant to Google Analytics, the information would reveal that a 34-year-old woman from Charlotte, North Carolina (North America - USA) at her home's IP Address 69.217.130.96 using Mozilla Firefox on a MacOsX Sierra Studio computer requested or obtained a specific video product from www.pesi.com.

**ANSWER:** Defendant denies the allegations in this paragraph.

106.    While the information already disclosed by Defendant to Google Analytics is sufficient for identification of a particular user, the unique identifiers are also being told to Google AdSense and Google Leads Extension, which are not bound by the anonymized data collection of Google Analytics. Therefore, upon information and belief, Google AdSense and Google Leads are automatically able to amalgamate the information disclosed with data already existing within Google's servers to specifically identify a user back to their corresponding Gmail account to better serve that user with advertising.

**ANSWER:** Upon reasonable inquiry, Defendant lacks knowledge or information sufficient to form a belief that "the unique identifiers are also being told to Google AdSense and Google Leads Extension, which are not bound by the anonymized data collection of Google

07791\324881518.v3

Analytics" or that "Google AdSense and Google Leads are automatically able amalgamate the information disclosed with data already existing within Google's servers to specifically identify a user back to their corresponding Gmail account to better serve that user with advertising." Defendant denies the remaining allegations in this paragraph.

107.    Simply put, when a person requests or obtains a prerecorded video from Defendant's website, Google Analytics or any ordinary person can identify that user by email address, client ID, or by using the approximate map of IP addresses when coupled with the other identifiers discussed above. Separately, Google AdSense and Leads can identify a user if it chooses through the automatic culling together of preexisting data within its servers including that person's gmail account.

**ANSWER:**    Defendant denies the allegations in this paragraph.

108.    Defendant intentionally installed the Pinterest Tag on its website, which operates in a similar fashion to the Meta Pixel. Specifically, Pinterest assigns each accountholder with a user ID ("uid"), which is found in the "s_a" cookie that is an encrypted value identifying only one particular person's Pinterest account as they navigate non-Pinterest websites, similar to Meta's FID. To create a Pinterest account, a person must provide their first and last name, age, gender (optional), email address, country, region, and preferred language. This information is directly linked to a person's s_a encrypted value, thereby directly allowing for identification of one particular person per s_a cookie.

**ANSWER:**    Defendant admits that it installed the Pinterest Tag on its website. Defendant denies that a person must provide their real and actual first and last name, age, gender, email address, country, region, and preferred language to create a Pinterest account. Defendant denies that "this information…directly allow[s] for identification of one particular person per s_a

cookie." Upon reasonable inquiry, Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.

109.    The same s_a value is communicated to Defendant via the Pinterest Tag and Defendant then stores the same value in their own cookie. Defendant would not know anything about a particular Pinterest user but for its installation of the Pinterest Tag on its website.

**ANSWER:**    Defendant denies the allegations in this paragraph.

110.    Simply put, when a person requests or obtains a prerecorded video from Defendant's website, Pinterest or any ordinary person can identify that user by uid in the s_a cookie or other information disclosed via the Pinterest Tag by simply going to a person's Pinterest profile and right-clicking "Inspect Source" and cross referencing the information disclosed against the information in the source.

**ANSWER:**    Defendant denies the allegations in this paragraph.

111.    At all times relevant hereto, Defendant knew that Google Analytics and Pinterest Tag were disclosing its customers' Personal Viewing Information to Google and Pinterest.

**ANSWER:**    Defendant denies the allegation in this paragraph.

112.    Before transmitting its customers' Personal Viewing Information to Google and Pinterest, Defendant failed to notify any of them that it would do so, and none of them have ever consented (in writing or otherwise) to these practices.

**ANSWER:**    Defendant denies the allegations in this paragraph.

113.    By intentionally disclosing to Google and Pinterest Plaintiff's and its other customers' unique identifiers together with the specific video material that they each purchased, without any of their consent to these practices, Defendant knowingly violated the VPPA on an enormous scale.

07791\324881518.v3

**ANSWER:**    Defendant denies the allegation in this paragraph.

## CLASS ACTION ALLEGATIONS

114.    Plaintiff seeks to represent four classes defined as follows:

**Data Brokerage Class:** All persons in the United States who, during the two years preceding the filing of this action, purchased prerecorded video material from Defendant and had their Personal Viewing Information disclosed to a third-party by Defendant's rental, sale, or other disclosure by way of Nextmark lists.

**Meta Pixel Class:** All persons in the United States who, during the two years preceding the filing of this action, purchased prerecorded video material or services from Defendant's www.pesi.com Website or any of its affiliates' websites while maintaining an account with Meta Platforms, Inc. f/k/a Facebook, Inc.

**Google Analytics Class:** All persons in the United States who, during the two years preceding the filing of this action, purchased prerecorded video material or services from Defendant's www.pesi.com Website or any of its affiliates' websites while maintaining an account with Alphabet, Inc. f/k/a Google.

**Pinterest Tag Class:** All persons in the United States who, during the two years preceding the filing of this action, purchased prerecorded video material or services from Defendant's www.pesi.com Website or any of its affiliates' websites while maintaining an account with Pinterest, Inc.

**ANSWER:**    Defendant admits that Plaintiff seeks to represent four putative classes. Defendant denies that Plaintiff is an appropriate class representative and denies that class relief is appropriate.

115.    Members of each Class are so numerous that their individual joinder herein is impracticable. On information and belief, members of the Classes number in at least the tens of

48

thousands. The precise number of members in each Class and their identities are unknown to Plaintiff at this time but may be determined through discovery. Members of each Class may be notified of the pendency of this action by mail and/or publication through the membership records of Defendant.

**ANSWER:** Defendant denies the allegations in this paragraph and denies that class relief is appropriate.

116.    Common questions of law and fact exist for all Classes and predominate over questions affecting only individual class members. Common legal and factual questions include but are not limited to (a) whether Defendant embedded the Meta Pixel, Google Analytics, and Pinterest Tag on its Website that monitors and tracks actions taken by visitors to its Website; (b) whether Defendant reports the actions and information of visitors to Meta, Google, and Pinterest; (c) whether Defendant knowingly disclosed Plaintiff's and Class members' Personal Viewing Information to Meta, Google, and Pinterest; (d) whether Defendant's conduct violates the Video Privacy Protection Act, 18 U.S.C. § 2710; and (e) whether Plaintiff and the Classes are entitled to a statutory damage award of $2,500, as provided by the VPPA.

**ANSWER:** Defendant denies the allegations in this paragraph and denies that class relief is appropriate.

117.    The named Plaintiff's claims are typical of the claims of the Classes in that the Defendant's conduct toward the putative class is the same. That is, Defendant embedded the Tracking Technologies on its Website to monitor and track actions taken by consumers on its Website and report this to Meta, Google, and Pinterest. Further, the named Plaintiff and members of the Classes suffered invasions of their statutorily protected right to privacy (as afforded by the VPPA), as well as intrusions upon their private affairs and concerns that would be highly offensive

to a reasonable person, as a result of Defendant's uniform and wrongful conduct in intentionally disclosing their Private Purchase Information to Meta, Google, and Pinterest.

**ANSWER:**   Defendant denies the allegations in this paragraph and denies that class relief is appropriate.

118.    Plaintiff is an adequate representative of the Classes because she is interested in the litigation; her interests do not conflict with those of the Classes she seeks to represent; she has retained competent counsel experienced in prosecuting class actions; and she intends to prosecute this action vigorously. Plaintiff and her counsel will fairly and adequately protect the interests of all members of each Class.

**ANSWER:**   Defendant denies the allegations in this paragraph and denies that class relief is appropriate.

119.    The class mechanism is superior to other available means for the fair and efficient adjudication of Class members' claims. Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by this case's complex legal and factual issues. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication of the common questions of law and fact, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

**ANSWER:**   Defendant denies the allegations in this paragraph and denies that class

relief is appropriate.

## CAUSES OF ACTION

**I.     COUNT 1: VIOLATION OF THE VIDEO PRIVACY PROTECTION ACT, 18 U.S.C. § 2710 (DATA BROKERAGE CLASS)**

120.    Plaintiff repeats the allegations asserted in paragraphs 1-64 and 114-119 as if fully set forth herein.

**ANSWER:**    Defendant repeats and re-asserts its answers to the previous paragraphs as if fully set forth herein.

121.    The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally identifying information" concerning any "consumer" to a third party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C. § 2710.

**ANSWER:**    Defendant admits that the allegations in this paragraph purport to cite to statutory law. Defendant denies that the allegations in this paragraph accurately characterize the law when considered as a whole.

122.    As defined in 18 U.S.C. § 2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials[.]" Defendant is a "video tape service provider" as defined in 18 U.S.C. § 2710(a)(4) because it is engaged in the business of selling and delivering prerecorded video materials, similar to prerecorded video cassette tapes, to consumers nationwide.

**ANSWER:**    Defendant admits that the allegations "As defined in 18 U.S.C. § 2710(a)(4), a 'video tape service provider' is 'any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar

51

audiovisual materials[.]'" purport to cite to statutory law, but denies that those allegations accurately characterize the law when considered as a whole. Defendant denies the remaining allegations in this paragraph as they call for a legal conclusion to which no response is required. To the extent a response is required, Defendant denies the remaining allegations in this paragraph accurately characterize the nature of its business when observed as a whole.

123.    As defined in 18 U.S.C. § 2710(a)(1), a "'consumer' means any renter, purchaser, or consumer of goods or services from a video tape service provider." As alleged above, Plaintiff and Data Brokerage Class members are each a "consumer" within the meaning of the VPPA because they each purchased a subscription to access prerecorded video material or services from Defendant's Website that was sold and delivered to them by Defendant.

**ANSWER:**    Defendant admits that the allegations "As defined in 18 U.S.C. § 2710(a)(1), a 'consumer' means any renter, purchaser, or consumer of goods or services from a video tape service provider'" purport to cite to statutory law, but denies that those allegations accurately characterize the law when considered as a whole. Defendant denies the remaining allegations in this paragraph.

124.    As defined in 18 U.S.C. § 2710(a)(3), a "'personally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." The Personal Viewing Information that Defendant rented, sold, or otherwise disclosed to data aggregators, data brokers, data appenders, and the like constitutes "personally identifiable information" as defined in 18 U.S.C. § 2710(a)(3) because it identified Plaintiff and Data Brokerage Class members to third parties as an individual who purchased, and thus "requested or obtained," prerecorded video content from Defendant's Website.

**ANSWER:**     Defendant admits that the allegations "As defined in 18 U.S.C. § 2710(a)(3), 'personally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider" purport to cite to statutory law, but denies that those allegations accurately characterize the law when considered as a whole. Defendant denies the remaining allegations in this paragraph.

125.     Defendant knowingly disclosed Plaintiff's and Class members' Personal Viewing Information to data aggregators, data brokers, data appenders because Defendant knowingly rented, sold, or otherwise disclosed their customers' Personal Viewing Information to data aggregators, data miners, data brokers, data appenders, and other third parties.

**ANSWER:**     Defendant denies the allegations in this paragraph.

126.     Defendant failed to obtain informed written consent from Plaintiff or Class members authorizing it to disclose their Personal Viewing Information to data aggregators, data brokers, data appenders, or any other third party. More specifically, at no time prior to or during the applicable statutory period did Defendant obtain from any person who purchased prerecorded video material or services on its Website (including Plaintiff or Data Brokerage Class members) informed, written consent that was given in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer, that was given at the time the disclosure is sought or was given in advance for a set period of time, not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner, or that was given after Defendant provided an opportunity, in a clear and conspicuous manner, for the consumer to withdraw consent on a case-by-case basis or to withdraw consent from ongoing disclosures, at the consumer's election. See 18 U.S.C. § 2710(b)(2).

**ANSWER:**     Defendant admits that the allegations in this paragraph purport to cite to

07791\324881518.v3

statutory law, but denies that those allegations accurately characterize the law when considered as a whole. Defendant denies the remaining allegations in this paragraph as they call for a legal conclusion to which no response is required. To the extent a response is required, Defendant denies the remaining allegations in this paragraph.

127.    By disclosing Plaintiff's and Data Brokerage Class members' Persona Viewing Information, Defendant violated their statutorily protected right to privacy in their Personal Viewing Information.

**ANSWER:**    Defendant denies the allegations in this paragraph.

128.    Consequently, Defendant is liable to Plaintiff and Data Brokerage Class members for damages in the statutorily set sum of $2,500. 18 U.S.C. § 2710(c)(2)(A).

**ANSWER:**    Defendant denies the allegations in this paragraph.

**II.    Count 2: Violation of the Video Privacy Protection Act, 18 U.S.C.§ 2710 (Meta Pixel Class)**

129.    Plaintiff repeats the allegations asserted in paragraphs 1-55, 65-95, and 114-119 as if fully set forth herein.

**ANSWER:**    Defendant repeats and re-asserts its answers to the previous paragraphs as if fully set forth herein.

130.    The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally identifying information" concerning any "consumer" to a third party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C. § 2710.

**ANSWER:**    Defendant admits that the allegations in this paragraph purport to cite to statutory law. Defendant denies that the allegations in this paragraph accurately characterize the law when considered as a whole.

131.    As defined in 18 U.S.C. § 2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials[.]" Defendant is a "video tape service provider" as defined in 18 U.S.C. § 2710(a)(4) because it is engaged in the business of selling and delivering prerecorded video materials, similar to prerecorded video cassette tapes, to consumers nationwide.

**ANSWER:**    Defendant admits that the allegations "As defined in 18 U.S.C. § 2710(a)(4), a 'video tape service provider' is 'any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials[.]'" purport to cite to statutory law, but denies that those allegations accurately characterize the law when considered as a whole. Defendant denies the remaining allegations in this paragraph as they call for a legal conclusion to which no response is required. To the extent a response is required, Defendant denies the remaining allegations in this paragraph accurately characterize the nature of its business when observed as a whole.

132.    As defined in 18 U.S.C. § 2710(a)(1), a "'consumer' means any renter, purchaser, or consumer of goods or services from a video tape service provider." As alleged above, Plaintiff and Meta Pixel Class members are each a "consumer" within the meaning of the VPPA because they each purchased prerecorded video material or services from Defendant's Website that were sold and delivered to them by Defendant.

**ANSWER:**    Defendant admits that the allegations "As defined in 18 U.S.C. § 2710(a)(1), a 'consumer' means any renter, purchaser, or consumer of goods or services from a video tape service provider'" purport to cite to statutory law, but denies that those allegations accurately characterize the law when considered as a whole. Defendant denies the remaining allegations in

07791\324881518.v3

this paragraph.

133.    As defined in 18 U.S.C. § 2710(a)(3), "'personally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." The Personal Viewing Information that Defendant transmitted to Meta constitutes "personally identifiable information" as defined in 18 U.S.C. § 2710(a)(3) because it identified Plaintiff and Meta Pixel Class members to Meta as an individual who purchased, and thus "requested or obtained," prerecorded video content from Defendant's Website.

**ANSWER:**    Defendant admits that the allegations "As defined in 18 U.S.C. § 2710(a)(3), 'personally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider" purport to cite to statutory law, but denies that those allegations accurately characterize the law when considered as a whole. Defendant denies the remaining allegations in this paragraph.

134.    Defendant knowingly disclosed Plaintiff's and Meta Pixel Class members' Personal Viewing Information to Meta via the Meta Pixel technology because Defendant intentionally installed and programmed the Meta Pixel code on its Website, knowing that such code would transmit the prerecorded video content purchased by its consumers and the purchasers' unique identifiers (including FIDs).

**ANSWER:**    Defendant denies the allegations in this paragraph.

135.    Defendant failed to obtain informed written consent from Plaintiff or Meta Pixel Class members authorizing it to disclose their Personal Viewing Information to Meta or any other third party. More specifically, at no time prior to or during the applicable statutory period did Defendant obtain from any person who purchased prerecorded video material or services on its

Website (including Plaintiff or Meta Pixel Class members) informed, written consent that was given in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer, that was given at the time the disclosure is sought or was given in advance for a set period of time, not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner, or that was given after Defendant provided an opportunity, in a clear and conspicuous manner, for the consumer to withdraw consent on a case-by-case basis or to withdraw consent from ongoing disclosures, at the consumer's election. See 18 U.S.C. § 2710(b)(2).

**ANSWER:**    Defendant admits that the allegations in this paragraph purport to cite to statutory law, but denies that those allegations accurately characterize the law when considered as a whole. Defendant denies the remaining allegations in this paragraph as they call for a legal conclusion to which no response is required. To the extent a response is required, Defendant denies the remaining allegations in this paragraph.

136.    By disclosing Plaintiff's and Meta Pixel Class members' Personal Viewing Information, Defendant violated their statutorily protected right to privacy in their Personal Viewing Information.

**ANSWER:**    Defendant denies the allegations in this paragraph.

137.    Consequently, Defendant is liable to Plaintiff and Meta Pixel Class members for damages in the statutorily set sum of $2,500. 18 U.S.C. §2710(c)(2)(A).

**ANSWER:**    Defendant denies the allegations in this paragraph.

**III.    Count 3: Violation of the Video Privacy Protection Act, 18 U.S.C. § 2710 (Google Analytics Class)**

138.    Plaintiff repeats the allegations asserted in paragraphs 1-55, 96-107, and 111-119, as if fully set forth herein.

**ANSWER:**    Defendant repeats and re-asserts its answers to the previous paragraphs as

if fully set forth herein.

139.    The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally identifying information" concerning any "consumer" to a third party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C. § 2710.

**ANSWER:**    Defendant admits that the allegations in this paragraph purport to cite to statutory law. Defendant denies that the allegations in this paragraph accurately characterize the law when considered as a whole.

140.    As defined in 18 U.S.C. § 2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials[.]" Defendant is a "video tape service provider" as defined in 18 U.S.C. § 2710(a)(4) because it is engaged in the business of selling and delivering prerecorded video materials, similar to prerecorded video cassette tapes, to consumers nationwide.

**ANSWER:**    Defendant admits that the allegations "As defined in 18 U.S.C. § 2710(a)(4), a 'video tape service provider' is 'any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials[.]'" purport to cite to statutory law, but denies that those allegations accurately characterize the law when considered as a whole. Defendant denies the remaining allegations in this paragraph as they call for a legal conclusion to which no response is required. To the extent a response is required, Defendant denies the remaining allegations in this paragraph accurately characterize the nature of its business when observed as a whole.

141.    As defined in 18 U.S.C. § 2710(a)(1), a "'consumer' means any renter, purchaser,

or consumer of goods or services from a video tape service provider." As alleged above, Plaintiff and Google Analytics Class members are each a "consumer" within the meaning of the VPPA because they each purchased prerecorded video material or services from Defendant's Website that were sold and delivered to them by Defendant.

**ANSWER:** Defendant admits that the allegations "As defined in 18 U.S.C. § 2710(a)(1), a 'consumer' means any renter, purchaser, or consumer of goods or services from a video tape service provider'" purport to cite to statutory law, but denies that those allegations accurately characterize the law when considered as a whole. Defendant denies the remaining allegations in this paragraph.

142.    As defined in 18 U.S.C. § 2710(a)(3), "'personally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." The Personal Viewing Information that Defendant transmitted to Google constitutes "personally identifiable information" as defined in 18 U.S.C. § 2710(a)(3) because it identified Plaintiff and Google Analytics Class members to Google as an individual who purchased, and thus "requested or obtained," prerecorded video content from Defendant's Website.

**ANSWER:** Defendant admits that the allegations "As defined in 18 U.S.C. § 2710(a)(3), 'personally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider" purport to cite to statutory law, but denies that those allegations accurately characterize the law when considered as a whole. Defendant denies the remaining allegations in this paragraph.

143.    Defendant knowingly disclosed Plaintiff's and Google Analytics Class members' Personal Viewing Information to Google via the Google Analytics's integrated technology because

07791\324881518.v3

Defendant intentionally installed and programmed Google Analytics on its Website, knowing that such code would transmit the prerecorded video content purchased by its consumers and the purchasers' unique identifiers (including cid, uid, hashed email address, IP addresses,[43] and other user identifiers).

      **ANSWER:**   Defendant denies the allegations in this paragraph.

     144.   Defendant failed to obtain informed written consent from Plaintiff or Google Analytics Class members authorizing it to disclose their Personal Viewing Information to Google or any other third party. More specifically, at no time prior to or during the applicable statutory period did Defendant obtain from any person who purchased prerecorded video material or services on its Website (including Plaintiff or Google Analytics Class members) informed, written consent that was given in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer, that was given at the time the disclosure is sought or was given in advance for a set period of time, not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner, or that was given after Defendant provided an opportunity, in a clear and conspicuous manner, for the consumer to withdraw consent on a case-by-case basis or to withdraw consent from ongoing disclosures, at the consumer's election. See 18 U.S.C. § 2710(b)(2).

      **ANSWER:**   Defendant admits that the allegations in this paragraph purport to cite to statutory law, but denies that those allegations accurately characterize the law when considered as a whole. Defendant denies the remaining allegations in this paragraph as they call for a legal conclusion to which no response is required. To the extent a response is required, Defendant denies

---

[43] IP addresses are the locating identification for computers or devices that connect to the Internet or other Transfer Control Protocol / Internet Protocol ("TCP/IP") network.

07791\324881518.v3

the remaining allegations in this paragraph.

145.    By disclosing Plaintiff's and Google Analytics Class members' Personal Viewing Information, Defendant violated their statutorily protected right to privacy in their Personal Viewing Information.

**ANSWER:**    Defendant denies the allegations in this paragraph.

146.    Consequently, Defendant is liable to Plaintiff and Google Analytics Class members for damages in the statutorily set sum of $2,500. 18 U.S.C. § 2710(c)(2)(A).

**ANSWER:**    Defendant denies the allegations in this paragraph.

**IV.    Count 4: Violation of the Video Privacy Protection Act, 18 U.S.C. § 2710 (Pinterest Tag Class)**

147.    Plaintiff repeats the allegations asserted in paragraphs 1-55 and 96, 108-119 as if fully set forth herein.

**ANSWER:**    Defendant repeats and re-asserts its answers to the previous paragraphs as if fully set forth herein.

148.    The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally identifying information" concerning any "consumer" to a third party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C. § 2710.

**ANSWER:**    Defendant admits that the allegations in this paragraph purport to cite to statutory law. Defendant denies that the allegations in this paragraph accurately characterize the law when considered as a whole.

149.    As defined in 18 U.S.C. § 2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials[.]" Defendant is a

61

"video tape service provider" as defined in 18 U.S.C. § 2710(a)(4) because it is engaged in the business of selling and delivering prerecorded video materials, similar to prerecorded video cassette tapes, to consumers nationwide.

**ANSWER:**    Defendant admits that the allegations "As defined in 18 U.S.C. § 2710(a)(4), a 'video tape service provider' is 'any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials[.]'" purport to cite to statutory law, but denies that those allegations accurately characterize the law when considered as a whole. Defendant denies the remaining allegations in this paragraph as they call for a legal conclusion to which no response is required. To the extent a response is required, Defendant denies the remaining allegations in this paragraph accurately characterize the nature of its business when observed as a whole.

150.    As defined in 18 U.S.C. § 2710(a)(1), a "'consumer' means any renter, purchaser, or consumer of goods or services from a video tape service provider." As alleged above, Plaintiff and Pinterest Tag Class members are each a "consumer" within the meaning of the VPPA because they each purchased prerecorded video material or services from Defendant's Website that were sold and delivered to them by Defendant.

**ANSWER:**    Defendant admits that the allegations "As defined in 18 U.S.C. § 2710(a)(1), a 'consumer' means any renter, purchaser, or consumer of goods or services from a video tape service provider'" purport to cite to statutory law, but denies that those allegations accurately characterize the law when considered as a whole. Defendant denies the remaining allegations in this paragraph.

151.    As defined in 18 U.S.C. § 2710(a)(3), "'personally identifiable information' includes information which identifies a person as having requested or obtained specific video

62

materials or services from a video tape service provider." The Personal Viewing Information that Defendant transmitted to Pinterest constitutes "personally identifiable information" as defined in 18 U.S.C. § 2710(a)(3) because it identified Plaintiff and Pinterest Tag Class members to Pinterest as an individual who purchased, and thus "requested or obtained," prerecorded video content from Defendant's Website.

**ANSWER:** Defendant admits that the allegations "As defined in 18 U.S.C. § 2710(a)(3), 'personally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider" purport to cite to statutory law, but denies that those allegations accurately characterize the law when considered as a whole. Defendant denies the remaining allegations in this paragraph.

152.    Defendant knowingly disclosed Plaintiff's and Pinterest Tag Class members' Personal Viewing Information to Pinterest via the Pinterest Tag technology because Defendant intentionally installed and programmed the Pinterest Tag code on its Website, knowing that such code would transmit the prerecorded video content purchased by its consumers and the purchasers' unique identifiers (including the s_a cookie, uid, and other user and device identifiers identified above).

**ANSWER:** Defendant denies the allegations in this paragraph.

153.    Defendant failed to obtain informed written consent from Plaintiff or Pinterest Tag Class members authorizing it to disclose their Personal Viewing Information to Pinterest or any other third party. More specifically, at no time prior to or during the applicable statutory period did Defendant obtain from any person who purchased prerecorded video material or services on its Website (including Plaintiff or Pinterest Tag Class members) informed, written consent that was given in a form distinct and separate from any form setting forth other legal or financial

obligations of the consumer, that was given at the time the disclosure is sought or was given in advance for a set period of time, not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner, or that was given after Defendant provided an opportunity, in a clear and conspicuous manner, for the consumer to withdraw consent on a case-by-case basis or to withdraw consent from ongoing disclosures, at the consumer's election. See 18 U.S.C. § 2710(b)(2).

**ANSWER:**     Defendant admits that the allegations in this paragraph purport to cite to statutory law, but denies that those allegations accurately characterize the law when considered as a whole. Defendant denies the remaining allegations in this paragraph as they call for a legal conclusion to which no response is required. To the extent a response is required, Defendant denies the remaining allegations in this paragraph.

154.     By disclosing Plaintiff's and Pinterest Tag Class members' Personal Viewing Information, Defendant violated their statutorily protected right to privacy in their Personal Viewing Information.

**ANSWER:**     Defendant denies the allegations in this paragraph.

155.     Consequently, Defendant is liable to Plaintiff and Pinterest Tag Class members for damages in the statutorily set sum of $2,500. 18 U.S.C. § 2710(c)(2)(A).

**ANSWER:**     Defendant denies the allegations in this paragraph.

## AFFIRMATIVE DEFENSES

Defendant pleads the following affirmative defenses and legal defenses, without assuming the burden of proof where it lies with Plaintiff and without prejudice or waiver of its right to assert other or further defenses in the event that they should become applicable as a result of discovery, further investigation, or any subsequent changes in the law or the status of the parties.

07791\324881518.v3

## FIRST AFFIRMATIVE DEFENSE

Plaintiff lacks standing to bring the instant claims because Plaintiff has no injury in fact, and thus she has no standing under Article III of the United States Constitution.

## SECOND AFFIRMATIVE DEFENSE

Plaintiff consented to the alleged disclosures of her personally identifiable information.

## THIRD AFFIRMATIVE DEFENSE

All times pertinent herein, the alleged disclosures were the result of the knowing, willful actions of Plaintiff, and constituted a course of conduct pursued voluntarily and knowingly by Plaintiff.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiff's personally identifiable information was not disclosed to Meta, Google, and/or Pinterest because the PESI account that Plaintiff used to purchase prerecorded material was a business account associated with Plaintiff's business.

## FIFTH AFFIRMATIVE DEFENSE

Plaintiff's personally identifiable information was not disclosed to Meta, Google, and/or Pinterest, due to one or more intervening factors, including but not limited to: Plaintiff's browser; the device Plaintiff used; Plaintiff not being logged in to her Meta, Google, and/or Pinterest accounts on the same browser and same device used at the time of purchase; Plaintiff's enabling or disabling of her browser privacy settings; Plaintiff's enabling or disabling of browser add-ons; Plaintiff's use of incognito mode; the name on Plaintiff's Facebook profile page(s); and the email address associated with her Google account.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiff's personally identifiable information was not disclosed to Meta, Google, and/or Pinterest, because at the time of purchase, PESI did not have the Meta Pixel, Google Analytics,

65

and/or the Pinterest Tag configured to share purchase events.

**SEVENTH AFFIRMATIVE DEFENSE**

Plaintiff's personally identifiable information was not disclosed to NextMark or any other data brokerage, data aggregator, or data appender.

**EIGHTH AFFIRMATIVE DEFENSE**

PESI is not subject to the VPPA because it is not a video tape service provider.

**NINTH AFFIRMATIVE DEFENSE**

Plaintiff is not a consumer of PESI because she did not purchase goods or services from PESI; her business did.

**TENTH AFFIRMATIVE DEFENSE**

The information allegedly disclosed with Meta, Google, and Pinterest was not personally identifiable information because it did not readily permit an ordinary person to identify Plaintiff's video-watching behavior.

WHEREFORE, Defendant PESI Inc. prays that this Court enter judgment in its favor and against the Plaintiff.

Dated this 3rd day of June, 2025.

*Electronically signed by Brett B. Larsen*
Brett B. Larsen
State Bar No.: 1064355
Daniel J. Hollis
State Bar No.: 1128071
Attorneys for Defendant PESI, Inc.
Hinshaw & Culbertson LLP
790 N. Water Street, Suite 1950
Milwaukee, WI 53202
414-276-6464
blarsen@hinshawlaw.com
dhollis@hinshawlaw.com

07791\324881518.v3

David M. Schultz
IL Bar No.: 6197596
Hinshaw & Culbertson LLP
151 N. Franklin Street, Suite 2500
Chicago, IL 60606
312-704-3000
dschultz@hinshawlaw.com

07791\324881518.v3